## Stamp v. Commonwealth.

(Decided June 22, 1923.)

### Appeal from Jefferson Circuit Court (Criminal Division).

1. Homicide—Evidence Held Not to Establish Self-Defense.—In a prosecution for homicide, where the evidence showed defendant drove his car alongside that of deceased and then shot and killed deceased, defendant's testimony that deceased was reaching for his hip pocket, as though to get a pistol, when defendant fired to save himself, is not worthy of consideration, in view of evidence which showed beyond question that deceased was not armed.

2. Homicide—Defendant's Suspicions of Relations Between His Wife and Deceased Held Not to Prevent Killing Being Murder.—Even though defendant's suspicions of improper relations between deceased and defendant's wife were true, it was murder for defendant to drive his car alongside that in which deceased and his wife and child were riding and then to kill deceased.

3. Homicide—Evidence Held Not to Sustain Defendant's Charges Deceased had Been Intimate with Defendant's Wife.—In a prosecution for murder, where defendant claimed he killed deceased because he had been intimate with defendant's wife, evidence held insufficient to sustain the charge by defendant against his wife, in view of a letter written by him to the wife of deceased, asking her and deceased to intercede and persuade defendant's wife to return to him, and defendant's testimony at a former trial, denying the shooting and claiming an alibi.

4. Criminal Law—Change of Venue Rests in Trial Court's Discretion, and Ruling Not Disturbed, in Absence of Abuse.—The right of accused to a change of venue, under Criminal Code of Practice, section 194, or to the summoning of a special venire from another county, under section 207, rests largely in the discretion of the trial court, and unless it affirmatively appears that the discretion has been abused, the ruling will not be disturbed.

5. Criminal Law—Right to Change of Venue Rests on Statute.—The right to a change of venue in a criminal case is one provided by statute, and the Legislature has authority to provide for the extent and manner of its exercise, or might even take it away altogether.

6.  Criminal Law—Conviction Not Reversed for Ruling on Change of Venue, Unless Discretion has been Abused.—The Court of Appeals is not authorized to reverse the finding of the trial court on motion by accused for a change of venue in a criminal case, unless it is satisfied the trial court has abused its discretion, and it must affirmatively appear that the applicant cannot have a fair and impartial trial in the county where the court sits.

7.  Criminal Law—Affidavits Held Not to Show Abuse of Discretion in Denying Change of Venue.—Where accused filed only two short affidavits in support of his motion for change of venue on the ground of prejudice in the community against him, and two or three affidavits were filed by the Commonwealth, the credence to be given to the witnesses was a matter within the trial court's discretion, and he did not abuse a sound discretion in overruling the motion for the change.

8.  Criminal Law—Rulings of Trial Court During Selection of Jury are Not Reviewable.—Under Criminal Code of Practice, section 281, providing that the decision of the court on challenges to the panel and for cause, or on motions to set aside an indictment shall not be subject to exception, the rulings of the trial court on challenges or as to the manner in which the jury is selected or as to qualifications of jurors, however erroneous or prejudicial, cannot be reviewed, and therefore a contention that it was error to refuse to discharge the panel after one talesman had stated he believed defendant guilty cannot be considered.

9.  Homicide—Cause of Trouble Between Defendant and His Wife Held Immaterial.—In a prosecution for homicide, where defendant claimed deceased had been intimate with defendant's wife, and the Commonwealth had introduced evidence to show that defendant and his wife had previously had trouble, which was admitted by defendant, it was not error for the court to refuse to go into the collateral issue as to the cause of the previous trouble.

10.  Homicide—Details of Divorce Suit Between Defendant and His Wife Held Immaterial.—In a prosecution for murder, where defendant claimed deceased had been intimate with defendant's wife, and the Commonwealth offered in evidence the record in a divorce suit merely to show the date, when the trouble between defendant and his wife commenced, defendant was not prejudiced by the court's refusal to permit him to go into detail in his evidence concerning the several divorce suits he had had with his wife.

11.  Witnesses—Testimony as to Alibi at First Trial is Admissible to Contradict Self-Defense at Second Trial.—Where defendant had introduced at a former trial an affidavit to establish an alibi and at the second trial testified in his own behalf, admitted that he did the killing, and claimed self-defense, it was not error to permit the Commonwealth to produce as evidence the affidavit filed on the former trial, though it did discredit his subsequent testimony.

12.  Criminal Law—Remark of Defendant's Wife to Jury Held Not Prejudicial.—In a prosecution for homicide, where defendant

claimed deceased had been intimate with defendant's wife, the conviction need not be reversed because defendant's wife on one occasion approached the jury and addressed them, but was taken away by court officers before she had made the statement she evidently intended to make, especially where the jury did not know who it was that had approached them, since the deputy sheriff properly refused to answer their question as to her identity.

13. Homicide—Defendant's Testimony Held to Render Instruction on Manslaughter Proper.—In a prosecution for murder, where defendant testified that he shot deceased in necessary self-defense, because he saw deceased reaching for his hip pocket as if to get a pistol, such evidence, if given any consideration, would authorize a finding that there was a difficulty out of which the killing arose, and that it happened in sudden heat of passion or sudden affray, so that an instruction on manslaughter was proper.

14. Criminal Law—Questions Asked by Jurors Must be Objected to at the Time.—Accused cannot complain on appeal that questions asked witnesses by jurors during the course of the trial were not in proper form, because they were leading or for other reasons, where he made no objection to the questions at the time they were asked.

15. Witnesses—Asking of Questions by Jurors Should be Encouraged. —The practice of jurors asking questions of the witnesses should not be discourged, but rather encouraged, in the interest of justice and fair play, since it is often necessary to a fair understanding of the issues that they ask such questions.

16. Criminal Law—Attendance by Jury at Moving Picture Show Held Not Prejudicial to Accused.—The fact that jurors in a murder trial were taken one evening to a moving picture show, where they were seated separately from the rest of the audience, and where nothing connected with a murder trial was exhibited, was not prejudicial to accused, as he apparently conceded by charging that the jurors were taken to a different picture show at which an improper picture was shown.

17. Criminal Law—Conviction Cannot be Reversed Because of Insufficiency of Punishment.—The Court of Appeals has no power to reverse a judgment in a criminal case because of the insufficiency of the penalty inflicted by the jury, and therefore cannot reverse a conviction for manslaughter because the evidence clearly showed murder.

HUGGINS & OLDHAM, H. M. DENTON, MERRIT O'NEIL and M. M. LOGAN for appellant.

THOS. B. McGREGOR, Attorney General, LILBURN PHELPS, Assistant Attorney General, JOSEPH LAWTON and FRANK M. DRAKE for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE SAMPSON—
Affirming.

At twilight on a June evening in 1922, J. Smith Russell, with his wife and infant daughter, was motoring north on Third street boulevard in Jefferson county when appellant, Walter P. Stamp, also in an automobile, approached from the rear, crowded the Russell car to the sidewalk and fired five shots into the Russell car, killing J. Smith Russell instantly and wounding Mrs. Russell in the head so that she lost one eye, and slightly injuring the infant daughter, who was on the rear seat, and then dashed away in his car leaving his victims to their fate.

The indictment in this case accuses appellant Stamp of the willful murder of J. Smith Russell, and this is the charge upon which he was tried and found guilty of manslaughter. This is the second trial, his punishment being fixed at fifteen years' confinement in the state penitentiary. The judgment on the first trial, when he was given a death penalty, was reversed by this court for manifest errors. He appeals again, insisting that the judgment should be reversed because of alleged errors committed against him.

After carefully reading and studying the transcript of evidence presented on this appeal the court quite agrees with appellant Stamp that the judgment should be reversed if error can be found justifying it because the verdict is not the result of a fair and impartial trial, but our reasons for so concluding are very different from those assigned by him. We think the Commonwealth and not Stamp has a right to complain of the result.

The Russells were quietly and peacefully driving along the right side of the avenue at the time of the homicide. It was their custom to be upon this avenue on evenings like that and at about the same hour. This fact appears to have been known to Stamp, who hated them because he conceived, without evidence worth mentioning, that they had kept his wife from returning to him after he had cruelly and unmercifully abused her and left her a second or third time. The deceased, so far as the record discloses, did not know that appellant intended to do him injury and was entirely taken by surprise when Stamp began to fire into the Russell automobile. Certainly Russell had done nothing whatever at the time of the shooting to provoke the deadly shots,

although Stamp claims self-defense. Stamp could not have been jealous of Mrs. Russell, for she had not taken his wife from him, as he asserts Russell had done, nor did anything but that which was commendable. The innocent little child sitting on the rear seat of the car, at whom he fired one shot, injuring her but slightly, had not seduced his wife.

After stating that it was the custom of the deceased Russell to take his wife and baby for a drive in the afternoon on Third avenue, and that while driving on the afternoon of the homicide, she saw appellant in the twilight driving his car near that of deceased in a hesitating way, Mrs. Russell, wife of the deceased, stated in answer to the question, "Then explain what he (Stamp) did from then up to the time of the tragedy?"

"He drove very slow and he was in front of us and we were driving just at the same rate that we had been and we passed him just about 3816 and I identified him as I passed him and we kept on driving and he was driving so slow, I thought he was going to stop as we passed and we went on and then he came up. It must have been the other side of Dimling's drug store, and he came up just by the side of our car, crowding us, and then he let his car back and then he drove up real fast, just fender to fender, and he said, 'You all have broke up my home.' My husband said 'no,' and after that he began to shoot. He shot my husband, he shot and wounded me and he shot at my baby and, of course, I don't know what he did. I was not unconscious, I knew everything. I called for help and I said, 'Walter P. Stamp is the man who has done the shooting and for the police to get him,' and with that they took me into Mrs. Gatewood's home and then they took me to the Norton Infirmary and I don't know where he went after the shooting." "Q. Where were you shot? A. In the temple and I lost the sight of my eye. Q. What happened to Mr. Russell, when he was shot did he fall over or what did he do? A. He never had a chance to do anything because he was instantly killed and when I looked his head had went back, and, of course, with that I got out of the car with the assistance of someone, I don't know who, and, of course, I never seen Mr. Russell any more. . . . Q. At whom did he aim? A. He aimed to shoot Mr. Russell, myself and baby. Q. At whom did he fire? A. He fired at all of us. Q. About

how many shots did he fire? A. Three shots—there were five shots fired.''

On the first trial appellant Stamp did not testify but filed his own affidavit, which set forth in detail a complete alibi; he then denied that he fired the shots or knew anything about the commission of the crime. He filed the affidavit of two or three other persons sustaining him in his false alibi. On the last trial, when the Commonwealth had so enmeshed him in evidence showing that he had not only fired the fatal shots but had planned willful murder before doing so, he changed his defense from that of alibi to self-defense and the unwritten law, in the name of which so many atrocious crimes have recently been committed. Appellant testified on the last trial that the deceased, Russell, was reaching for his hip pocket as though to get a pistol with which to shoot appellant, when appellant to save himself fired the fatal shot. The evidence shows beyond question that Russell was not armed. He had no firearms. No pistol was found upon his body or about his automobile. He had none. So this defense is not worthy of consideration. In view of the other false statements which appellant now admits he heretofore made, the most damning defense of all is that in which this vile criminal undertakes, in order to save his neck, to traduce the good name of his wife, the mother of his child, by pretending that he thought the deceased, Russell, and appellant's wife had been guilty of criminal conversation. The evidence shows that while appellant lived with his wife at different times before the homicide he was very abusive to her and frequently wrongfully accused her of intimacy with men. His letters written shortly before the homicide in an endeavor to procure other persons to induce his wife to take him back prove beyond peradventure that he did not believe his wife had been untrue to him or that she was anything less than a virtuous, good woman. One letter dated April 15, 1921, reads:

''Dear Mrs. Russell: Won't you have a talk with Eva, and ask her to reconsider and come back to me, for there is our little boy between us whom I love, and I am telling you frankly that I love Eva better than my own life, and she is the only woman that I feel like that I would ever care to love and if she will come back to me that it will make a new man of me and I will do everything in my power to make her one of the happiest girls in this world.

I want to say further that you have been told by some long-tongue people a lot of lies that I never said about you, which has caused you to be mad at me. I say frankly that I have no hard feelings against you or Mr. Russell and my best wishes are for you both. If you will help me out in this matter and get us back together you will find that my friendship can't be broken, it matters not what comes up in the future and that I will make Eva a good husband and that I will stop listening to what people says about her for that is what has been the matter now; there has been too many long-tongue people coming and telling me things about her that was not so. Will close by saying that anything you will do to help us back together will be greatly appreciated. Your friend, Walter Stamp.''

Granting, however, that all that appellant testified to concerning his suspicions of his wife and the deceased were true, he was no less a murderer when he fired the fatal shot. We do not believe from the evidence, however, that the wife was guilty of the charges which her wicked husband now makes against her. The overwhelming weight of the evidence is to the contrary.

Appellant relies upon several alleged grounds for reversal of the judgment, and if the court can find merit in any one of them it will not only be its duty but its pleasure in this case to reverse the judgment in order that the state—the people—may have a fair trial and that this vile criminal may pay the penalty of a red-handed murder.

His first ground is stated in brief of counsel as follows: ''The court erred in overruling appellant's motion for a change of venue, and his motion for a special venire to be called from another county.'' This is based upon sections 194 and 207 of the Criminal Code. Section 194 of the Criminal Code reads:

''If the judge of the court be satisfied, after having made a fair effort in good faith, for that purpose, that, from any cause, it will be impracticable to obtain a jury free of bias in the county wherein the prosecution is pending, he shall be authorized to order the sheriff to summon a sufficient number of qualified jurors from some adjoining county in which the judge shall believe there is the greatest probability of obtaining impartial jurors, and from those so summoned the jury may be formed.''

The matter of granting a change of venue is largely in the discretion of the trial court, and unless it affirm-

atively appear that this discretion has been abused, its ruling will not be disturbed. This is the long-established rule of this court. Mansfield v. Com., 163 Ky. 488. The right to change of venue in a criminal case is one provided by statute and the legislature has authority to provide for the extent and manner of its exercise. It might take it away altogether or it could change the method of invoking it. We are not authorized to reverse the finding of the trial court upon a motion for a change of venue, in a criminal case, except in instances where we are satisfied that the trial court has abused its discretion. In other words, it must affirmatively appear that the applicant for change of venue cannot have a fair and impartial trial in the county where the court sits.

The text of 16 C. J., page 205, in discoursing upon this subject, says:

"Where it is shown that there exists within the county wherein the indictment was found such excitement or prejudice as would preclude a fair and impartial trial, accused is entitled to a removal; and where the affidavits show by a preponderance of evidence that the trial court has palpably abused its discretion in denying a change of venue, the appellate court will interfere and direct a new trial. On the other hand, it is not sufficient merely to show that great prejudice exists against accused; it must appear that the prejudice against him is so great as to prevent him from receiving a fair and impartial trial, and where the evidence before the court is conflicting, its decision will not be reversed upon appeal, and if the affidavits tending to show prejudice are met by an equal or a greater number, the court properly in its discretion may deny the application."

To the same effect is the text in 16 R. C. L., p. 262. We have in effect adopted this rule in numerous cases. Browder v. Commonwealth, 136 Ky. 45; Heck v. Commonwealth, 163 Ky. 518.

In the case before us only two short affidavits were filed for the appellant in support of his motion for a change of venue, and two or three for the Commonwealth. The evidence was about equal, unless as appears, the trial court gave greater credence to the witnesses for the Commonwealth, which was a matter entirely within its discretion. Clearly the trial judge did not abuse a sound discretion in overruling the motion for a change of venue, and for the special venire.

The second contention of appellant is that the court erred in overruling defendant's motion to discharge the jury when a juror, after seven others had been accepted, stated that he had the opinion that the defendant was guilty. After seven jurors had been examined and accepted by the parties, one Nevin was called to the box and on his *voir dire* he was asked: "Q. Have you ever formed any opinion? A. Yes, I have. Q. Have you ever expressed the opinion? A. I have. Q. To whom? A. To the judge. By Mr. Huggins: Judge Burgevin? A. Yes, I came down and asked him to be excused Saturday and told him then in my opinion the man was guilty." To these last answers counsel for appellant objected. Later they moved to discharge the seven jurors who heard him make the answer. The court overruled the motion but sustained Mr. Huggins' challenge to the juror for cause, and Nevin stood aside. While the juror answered that he believed the appellant guilty he did not say of what he believed him to be guilty. Incidents like this frequently happen in the examination of jurors. He stated, however, that what opinion he had was formed principally on newspaper reports and that he could lay all this aside and grant the defendant a fair and impartial trial. We have a Criminal Code provision upon the subject, section 281, reading:

"The decisions of the court upon challenges to the panel, and for cause, or upon motions to set aside an indictment, shall not be subject to exception."

In construing this section we have repeatedly held that rulings of the trial court upon challenges to the panel or for cause or as to the manner in which the jury is selected or as to the qualification of jurors, are not subject to exception, and the action of the trial court in respect to these matters, however erroneous or prejudicial to the accused, cannot be reviewed on appeal. Sowders v. Commonwealth, 197 Ky. 834; Partin and Allen v. Commonwealth, 197 Ky. 840; Dunnaway v. Commonwealth, 198 Ky. 605. Appellant cites no Kentucky authority on the subject but does cite some foreign cases. Our rule is based upon the code provision and has not been varied. This ground must therefore be overruled.

Appellant insists that the court erred in admitting incompetent evidence offered by the Commonwealth and in rejecting competent evidence offered by defendant. We have examined the several bits of evidence to which ap-

pellant objected, and which he now insists were incompetent, and find them at least harmless although they may have been erroneous. For instance, appellant says the Commonwealth introduced evidence to show that he and his wife had previously had trouble. He admits the truth of this and says he desired and offered to testify that all the trouble was caused by Russell and his wife. The only relevant matter was whether appellant and his wife had domestic trouble. How it came about was not important. The court could not go into such collateral matters. The Commonwealth states it offered the record in the divorce suit merely to show the date when the domestic trouble in the Stamp family commenced and to prove that the Russells were not in any way responsible for the infelicity in the Stamp home. The divorce record was not read to the jury. Appellant was not prejudiced by the court's refusal to allow him to go into detail in his evidence concerning the several divorce suits he had with his wife.

Inasmuch as appellant on the last trial was claiming self-defense it was entirely competent for the Commonwealth to produce as evidence appellant's affidavit filed on the former trial to the effect that he was not present at the time of the killing and did not fire the shots which took the life of Russell and did not injure his wife and child. Certainly appellant cannot complain of this, although it flatly contradicts his evidence upon the last trial, and affects very deleteriously its probative value. We find no evidence introduced by the Commonwealth which was prejudicial to the substantial rights of appellant nor evidence offered by appellant and rejected by the court which he was entitled to introduce and which adversely affected his substantial rights.

Appellant next insists that the trial court erred in overruling his motion to discharge the jury when Mrs. Stamp attempted to approach and converse with the jurors. The facts with respect to this incident are stated by the witnesses in substance as follows: Mrs. Stamp, who was in the courtroom, came inside the bar while counsel were out of the courtroom in consultation. She walked up to the jury box and began to say something when the court reporter and one Settle, who were nearby, took her away before she had completed the first sentence. She only said, "Gentlemen of the jury, I want to," at which time the two gentlemen took hold of her and led her away from the jury. What she intended to say is mere con-

jecture. At any rate she said nothing of consequence to the jury, nothing that was calculated to influence the jury one way or the other. After she was taken away some of the jurors asked the deputy sheriff in charge her name, but the deputy, faithful to his duties, declined to give her name, and the jury did not know by whom they were approached or why. It could not therefore have influenced their verdict in the slightest.

The instructions given by the court to the jury are attacked as erroneous. Appellant insists that no instruction upon the law of manslaughter should have been given. If we give any consideration to that part of the evidence of appellant wherein he states that the deceased was, in appellant's judgment, about to draw a deadly weapon and appellant fired in self-defense; that there was a difficulty out of which the killing arose, and that the shooting happened in sudden heat of passion or sudden affray, it must be admitted that the instruction upon the law of manslaughter was not only proper but absolutely necessary to present one theory of the defense. Had the court failed to give such an instruction it would have been reversible error. The instructions given are not only direct, certain and concrete but couched in clear and understandable language, and presented the whole law of the case.

Appellant makes one rather unusual complaint under the head of "Error in Permitting Misconduct of the Jurors." This alleged misconduct consisted in the jurors asking questions of witnesses during the trial. These questions were not always formulated according to legal procedure and oftentimes were leading and sometimes irrelevant, yet counsel for appellant did not object to such questions, and in the absence of such objection it was not the duty of the trial court to interfere and stop the questioning by members of the jury, or admonish the jury, who were there for the purpose of learning all the facts. Of course, appellant could have required the ruling of the trial judge upon such questions had the objection thereto been made, but having sat silently by and allowed the questions to be asked and answered without objection he is in no position to complain. Moreover, it is often necessary to a fair understanding of the issues that jurors ask question of the witnesses. The practice should not be discouraged but rather encouraged in the interest of justice and fair play.

Appellant lays greater stress upon the alleged misconduct of the jury in attending a picture show than upon any other one of his grounds for a reversal of the judgment. It appears that on Sunday night while the trial was in progress the jurors, who had been engaged in the trial for several days and in close confinement, asked the three deputy sheriffs who had them in charge to take them to a moving picture show at the Rialto Theater, on Fourth street, in Louisville. The jury was quartered at the Tyler hotel, four or five blocks away. Complying with the request of the jury the deputy sheriffs, being alert to their duty, took the jury from the Tyler hotel at the northeast corner of Jefferson and 3rd streets, down Third street to Walnut, where they had supper, and from there they went back to Third street and to avoid the crowd continued down Third street to Chestnut street; thence over to Fourth and to the Rialto Theater. The three deputies, it appears, did their utmost to see that the jurors were fully protected from interferences by persons interested in the trial. There were two balconies in the theater. The first floor was crowded but the second floor balcony had very few people in it. The Rialto is a very large theater. To protect the jurors from imposition the deputy sheriffs selected a place on the second balcony near which no other persons sat and there seated the jury. All other persons were kept away from the jury. Nothing was said or done in the presence or hearing of the jury that had any bearing whatever upon the trial of appellant, and each of the deputy sheriffs stated that the picture show, "Ebbtide," had nothing to do with a murder trial or with anything affecting the trial of appellant. They stated "there was no scene in said picture showing a defendant standing trial for murder; there was no scene showing an interested party climbing over the railing into the jury box during the progress of any trial; there was no trial scene whatever in said picture. Said picture show at the Rialto Theater was the only picture show seen by the jury during said trial." In telling about the situation of the jury at the theater the three sheriffs stated: "Said picture show house contains a mezzanine balcony and another balcony up above the mezzanine balcony; there were hardly any people in the second balcony, and the jury sat in one part of the balcony isolated from any other auditors and no one said anything

in their presence." Thus it clearly appears from the evidence of the three sheriffs that the jury was not exposed to any conversation or talk about the Stamp trial or any other murder trial; that there was no misconduct on the part of the jury nor of other persons in the presence of the jury with respect to the trial. It may therefore be said in this case, as in the Mansfield case, 163 Ky. 488, "We do not find in this circumstance any misconduct on the part of the officers or the jury." The eagerness of appellant to seize upon some slight circumstance upon which to ask a reversal of the judgment is shown by the fact that both he and certain members of his counsel stated in motions and affidavits that the sheriffs had allowed the jury to go to the Alamo Theater to see a picture styled "Notoriety" in the afternoon of Sunday. This was entirely a mistake. The jury did not go to the Alamo Theater. The one they did attend was not on Sunday afternoon. With the record is filed large bill posters showing the advertising of the picture "Notoriety," and affidavits containing statements of the nature and banefulness of the several scenes therein embraced, ending with loud lamentations concerning the effect such a picture likely had upon the mind of the jury. As this was later discovered to be absolutely without foundation it is unnecessary to further discuss this subject.

The eminent trial judge made a patient and ceaseless effort to see that appellant received a fair and impartial trial. He gave him every opportunity to show his innocence. Every doubt was resolved in favor of appellant. The jury dealt exceedingly kindly with appellant. Just how, under the state of the record, with all the facts before it showing that appellant Stamp on the evening of the homicide deliberately planned the murder not only of Russell but of his wife and innocent child, and executed it in large part, without the slightest excuse, the jury found appellant guilty of manslaughter, we are unable to say. The wonder is that the verdict was so slight. The Commonwealth did not have a fair trial—the people, who have a right to expect the law to be enforced in its strength and vigor, are the only ones who have the right to complain of the verdict in this case. There can be found no word or act of the appellant, either before or at the time of the killing, that even suggests in the slightest way his innocence of the crime of wilful murder. Having on oath presented two entirely different defenses

(1.) an alibi, and (2) self-defense, appellant's evidence was entitled to very little, if any, credence. By his cunning and deceit appellant succeeded in cheating justice. This court has no power to reverse a judgment in a criminal case because of the insufficiency of the penalty inflicted by the jury. It must therefore be affirmed.

Judgment affirmed. Judge McCandless not sitting.