### Powell et al. v. Commonwealth.

Oct. 28, 1938.

Rehearing Denied Jan. 27, 1939.

236

SHUMATE & SHUMATE for appellants.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The two appellants, Arnold Powell and Bonnie Griffin, were accused by indictment of murdering Martha Short, which was committed in Estill county near the line between it and Madison county. At their trial they were convicted and given the death sentence. The same grand jury that returned the instant indictment also returned a similar one accusing the same parties of murdering Marion Short, the husband of the victim in the instant indictment. Appellants were first tried on the indictment for murdering the husband and were found guilty and punished with life imprisonment. No appeal was prosecuted therefrom. At a later term of the court they were tried on the indictment for murdering Mrs. Short (which is the instant case) with the result stated. On this appeal from that judgment a number of grounds are argued in brief of counsel for appellants which they insist are sufficient to authorize a reversal of the judgment. As contained in the motion for a new trial they are: (1) Error of the court in obtaining the jury from the adjoining county of Clark; (2) error in overruling appellants' motion for a directed verdict of acquittal; (3) that the verdict is flagrantly against the evidence; (4) error in the instructions submitted to the jury by the court; (5) admission of incompetent evidence offered by the commonwealth over defendants' objections; (6) rejection of competent evidence offered by defendants; (7) misconduct of the sheriff in permitting the jury to go to a picture show on the night of February 17, 1938, while the trial was pending but unfinished; and (8) improper argument of prosecuting counsel. We will dispose of them in the order named.

1. The facts with reference to ground (1) are that the crime which someone committed was of such a brutal nature as to incite the indignation of practically all of the people of Estill county. There had been one trial involving the same facts when appellants were tried for

murdering Marion Short on the separate indictment accusing them thereof. The court, however, managed to procure a local jury after that trial in an effort to try the instant one at the term preceding the one at which the judgment complained of herein was rendered; but before that jury was sworn something happened to require a postponement of the trial and the jury so selected was discharged without jeopardy attaching. At the term of the instant trial there were 29 jurymen on the regular panel and none of them qualified, since each of them had an opinion gathered from the notoriety of the case because of the facts stated.

Some of the county's foremost citizens filed affidavits that they were acquainted with the sentiment throughout Estill county, and gave it as their opinion that a fair and impartial jury could not be selected from eligible jurors residing in the county. On such a showing and in such circumstances the court directed the jury to be summoned from Clark county, and we think properly so.

The only case cited in support of this ground is that of Alsept v. Commonwealth, 245 Ky. 741, 54 S. W. (2d) 337. The opinion in that case does not recite the facts upon which the court acted in summoning the jury from another county. It only directed attention to section 194 of the Criminal Code of Practice, and then said that the facts upon which the court acted in that case in procuring the jury from another county were insufficient to sustain his action in that regard; but nowhere does it appear in the opinion what those facts were. An examination of the record shows the entire absence of a good faith effort to procure the jury from the county in which the indictment was returned, and the opinion points out that under the present state of the law this court has authority to review such action and to reverse a judgment of conviction if the requirements of that section are not substantially followed. However, the cases of Scott v. Commonwealth, 250 Ky. 70, 61 S. W. (2d) 1078; Johnson v. Commonwealth, 250 Ky. 297, 62 S. W. (2d) 1025; Williams v. Commonwealth, 258 Ky. 574, 80 S. W. (2d) 573, and others cited therein clearly sustain the court's action in this case and justify the conclusion that a fair effort was made in good faith to obtain a jury from Estill county, and also to sustain the conclusion that it would be impracticable to do so because of the

facts hereinbefore referred to. We are clearly of the opinion that this alleged error is without merit.

2, 3. Grounds (2) and (3) relate exclusively to the evidence and will be disposed of together. The two victims, Marion Short and his wife, Martha Short, lived alone without children or other joint occupants of the home in a building containing four rooms, located in a rural section of Estill county. Mr. Short ran a country store in the front room of that building and he and his wife occupied the other three rear rooms as their residence—the immediately adjoining room to the one in which the store was operated being their sitting or family room. It was heated by an old-fashioned fire place. They were each acquainted with the two appellants who resided in the same neighborhood. About 8:30 or 9 o'clock on the fatal night the neighbors discovered a fire in the direction of the Short residence. As soon as they could dress themselves and travel the distance to the scene, the fire had advanced to such an extent that it had practically consumed the building, but the persons gathered there could see through the blaze the bodies of two individuals lying upon the floor of the living room. One of them was smaller than the other and appeared to be that of a female; whilst the other was larger and was supposed to be that of a male person. Physician witnesses who saw the mutilated bodies later so testified in giving their opinion. When the fire became reduced sufficiently for the purpose, the information so gained was substantiated to the extent that there were two bodies, but the fire had burned asunder their heads and some of their limbs, and had so consumed them as that the sex to which each belonged could not be determined. However, portions of the clothing with which the bodies were dressed were found immediately under them at spots and places where the bodies were in immediate contact with the floor, and witnesses testified that the pieces of cloth so found and unburned under the smaller body were parcels of women's underwear; whilst such portions of unconsumed clothing under the larger body indicated that they came from garments worn by a masculine person. There was evidence, though slight, indicating that they corresponded to garments witnesses had seen before as having been worn by the respective victims.

Three ribs of the supposed male individual were

broken and a hole was in the head of the body of the supposed female. The Shorts were people who remained at home quite generally and seldom left it. They were seen and known to be at home shortly before the fire and neither of them have ever been seen or heard of since. Mr. Short had a gray, and also a brown suit of clothes which his neighbors had theretofore observed him wearing. When some five or six days thereafter appellants were arrested in Hamilton, Ohio, it was shown that when they arrived there they had the two suits of clothes above described and witnesses swore, according to their opinion, that they were suits belonging to Mr. Short. They also had in their possession a pistol, which was completely identified as one belonging to Mr. Short, and which he kept in his store. They also had a more or less peculiar pocket knife which witnesses testified corresponded exactly to one they had seen in the possession of Mr. Short. After they arrived in Hamilton, Ohio, they frequently spent limited amounts of money—largely at slot machines, although it was testified that at least one of them had said on the day preceding the fatal night that he was without funds, and tried to borrow money. That testimony was furnished by a neighbor to whom that appellant owed 50 cents. The neighbor sought to collect it from him, but was told that he did not have the amount but that he was contemplating going away and his brother would settle the small amount. It was shown that on the same day they were frequently together in apparently secret conversation, and that at about 4 o'clock p. m. on that day Powell went to his home and packed his clothing in a suitcase and went from there to Griffin's residence where the latter put his clothing in the same grip. Neighbors who saw them at that time, and shortly following that time, were the last ones to see them until they appeared at Hamilton, Ohio, the next day following the fatal night. It is quite probable that the circumstances so related—which are undisputed—would themselves be sufficient to sustain the overruling of these grounds. But each of the defendants made a confession to the sheriff and deputy sheriff of Estill county about eight days after the commission of the crime when those officers went to Hamilton, Ohio, to return them to Kentucky—they having previously been arrested by some officers of that state on instructions from Kentucky authorities. It is the competency of those confessions that form the basis of ground (5),

complaining of the admission of incompetent testimony, and which question will be discussed when we reach that ground. If the confessions were properly admitted as we have determined they were, then grounds (2) and (3) are also most demonstrably without merit and cannot be sustained.

4. The only criticism in brief of counsel for appellants in support of ground (4) is that the jury were permitted thereby to find defendants guilty of murder, although they did nothing more than set the house on fire, which counsel insist was erroneous because ''There is no evidence whatsoever that Mr. and Mrs. Short were alive when the house burned.'' It is also insisted under this ground that the court should have submitted to the jury the competency of the confessions to be hereinafter discussed. No authority is cited in support of either of those contentions, and a reading of the instructions clearly demonstrates that no verdict of guilty could be returned by the jury unless its members believed that they were also guilty of maliciously producing the deaths of the two victims. There is no possible chance for any misleading of the jury in that respect by any of the language contained in any of the instructions. There were also no facts authorizing the submission to the jury of whether or not the confessions were inadmissible under our statute known as the ''Anti-sweating Act,'' which is contained in sections 1649b-1 to and including 1649b-4 of Baldwin's 1936 Revision of Carroll's Kentucky Statutes. This ground must, therefore, share the fate of the others preceding it as being without merit.

5. As stated, the commonwealth introduced written confessions made by each appellant after being arrested in Hamilton, Ohio, in the presence of the sheriff and deputy sheriff of Estill county, both of whom had gone there upon information after appellants were arrested. Neither appellant testified in the case and, of course, the version of neither of them as to what happened on that occasion was given to the court. Only the two Kentucky officers testified concerning the matter. They stated that when they met appellants in Hamilton they asked them (or one of them did) how they traveled from their home in Estill county to the place where they were arrested, Hamilton, Ohio. They then inquired about whether they knew anything concerning the deaths of

Mr. and Mrs. Short and the burning of their store and residence. They said that they had questioned appellants about the articles they had in their possession when they arrived in Hamilton, and that Powell then addressed the deputy sheriff, saying: "Bill, (his name being William Baber) we want to tell you about how this happened." He then asked the deputy sheriff: "Could I speak to you privately?" The officer consented and the two walked down a hall to its fartherest end. Powell then told the witness all about the murders and setting the building on fire after they were committed. He told of their departure and their final arrival in Hamilton. The two then returned to the room previously occupied, when Griffin made a similar statement.

A stenographer was then procured and each of them repeated their confessions and they were taken down and transcribed, when each subscribed his confession and they were both witnessed. The two witnesses testifying about how the confessions were made positively denied any persistent questioning of either appellant, or that any duress, threat, promise of reward, or any other incentive was made to induce either confession. Their testimony stands undenied in the record and presents, therefore, for our consideration a case where the accused criminal of his own accord, and to possibly ease his conscience, voluntarily told of his guilt, and how the deed was perpetrated. Both confessions are in substance the same, except they differed as to how appellants traveled from the scene of the crime to Hamilton, but which is an immaterial matter. The confession of Griffin, after stating his age, is in these words:

"About 10 o'clock in the morning I met Arnold Powell down on Copper Branch, Madison County, Kentucky. We sat down and talked about getting some money. We decided to rob Marion Short. After that I went on back to work until 4 o'clock. At 4 o'clock I met Arnold Powell and we went to the woods and cut two clubs. After getting the clubs we went on to Marion Short's house. We got to Short's house about 7 o'clock. We went in and I bought some smoking tobacco. Powell and I and Mr. and Mrs. Short sat around and talked about an hour. Then I told old man Short that I wanted some candy. Me and him walked into the storehouse to get the candy and while I was in the storehouse Arnold

Powell hit the woman. She hollered and he hit her again. Mr. Short went towards the room where his wife was, and when he reached the door I hit him in the back of the head. I hit Short a second time and he fell into the room where his wife was. When I entered the room I saw Mrs. Short lying on the floor struggling with Powell, and I picked up a chair and hit her in the head. She fell over and didn't do anything any more. The Powell boy searched Short's pockets and I went into the storehouse to see how much money was there. I found about five dollars altogether, and he found twenty. I peeped under the bed and found the gun. Then we just set the matches to the paper on the wall. Then we just got out and fastened the door and beat it down the road towards the Bark road. We went out the Bark road to Bear Waller, and from there to Kingston. We caught a coal truck at Kingston and rode it to Lexington. We walked through Lexington and caught us another truck to Cincinnati. We walked all through Cincinnati and caught an automobile and rode to Hamilton. We got out of the car up on the boulevard and I went to Piqua by hitch-hiking. I came back to Hamilton Monday, Jan. 11, 1937. I am making this statement of my own free will and accord and without any duress being used upon me and same may be used for or against me at any time."

It was signed by a mark and witnessed by three persons, and Powell's was executed in the same way.

Our Anti-sweating Act, as well as those of other jurisdictions, are intended to exclude and make incompetent confessions obtained by officers or, perhaps, others in authority through the application or exercise of most highly improper means or methods, amounting to duress or putting in fear, or the offering of inducements or temptations or otherwise, causing the confessor to make them from motives other than by his own voluntary will. Such statutes were never intended to exclude any and all confessions made to officers; but only such as were obtained through the means denounced by the statutes. Hence, we have held in a number of cases that where the proven confession was a voluntary one—though made to an officer while the accused was under arrest—was nevertheless admissible, provided always that its obtention was not superinduced by any of the means denounced by the statute. Some of

the latest cases so holding are Barton v. Commonwealth, 238 Ky. 356, 38 S. W. (2d) 218; Bennett v. Commonwealth, 242 Ky. 244, 46 S. W. (2d) 84; Caruth v. Commonwealth, 251 Ky. 143, 64 S. W. (2d) 495; Harrison v. Commonwealth, 266 Ky. 840, 100 S. W. (2d) 837, and others cited in those opinions. As stated, no coercive measures were employed in this case according to the only witnesses who testified to the fact, and in view of the cited cases and in the light of the object and purpose of the anti-sweating statute, we would stultify ourselves were we to sustain this objection in the condition of the testimony as brought to this court. This ground must, therefore, be overruled, and when done the confessions, plus the other proven facts in the case, as hereinbefore recited, clearly demonstrate beyond a possibility of doubt the guilt of appellants.

6. The only evidence complained of as being wrongfully excluded was the ruling of the court rejecting the opinion of a witness who, as a school teacher, had taught appellant Griffin, to the effect that in his opinion he (appellant) ''did not possess an average normal mind.'' Waiving the question of the competency to so testify—witness not being an expert—the record discloses that before leaving the stand he was permitted to state that ''He (Griffin) was about the dullest child of his age in the school. I thought I could not learn him. I don't know about his mind, but he was a mighty slow pupil.'' In that statement the witness disclaimed any knowledge as an expert or otherwise of the condition of Griffin's mind, but freely stated to the jury that he was not mentally alert. Therefore, if it should be considered an error of the court in rejecting the testimony complained of, it was completely cured by what the witness was permitted to later state, and this ground is likewise unavailable.

7. The facts forming the basis of ground (7) are, that on the night of February 16, 1938, with the consent of counsel for appellants, the sheriff, who had charge of the jury, went with them in a body to a picture show. On the next night (the 17th) they did the same thing. There is some dispute as to whether counsel knew of or consented to the sheriff taking the jury to the theatre on the last night, but having given their consent to such method of passing away the time on one night it could scarcely be concluded that counsel would object to the

same thing being done on the following night. But be that as it may, we held in the case of Stamp v. Commonwealth, 200 Ky. 133, 253 S. W. 242, that it was not a reversible error per se for the sheriff having charge of a jury in a homicide case to take the body to a picture show at night during the progress of the trial, unless there was something peculiar about the show that might bear upon the case they were then trying. The picture visited by the sheriff and the jury on the night of the 17th of February was called ''The Conquest'' and featured a part of the career of Napoleon Bonaparte as a conqueror, including his visiting with his army the city of Moscow, Russia. It is not shown that there was anything in the picture to enrage the passions of the spectators, or to prejudice them against one charged with homicide committed in times of profound peace, and we are unable to conceive how a jury composed of citizens of average intelligence could possilby be led astray and induced, by observing such a picture, to render a verdict the next day different from what they would have done had they not attended it. It is not shown that anyone talked or spoke to the jury on that occasion and they were closely guarded by the officer who had them in charge, and we are convinced that it would be a prostitution of the law to reverse a solemnly rendered verdict based upon the overwhelming evidence appearing in this case, solely upon the speculative ground that the members of the jury might have been unduly influenced in witnessing the picture show that they attended on the occasion complained of.

8. In support of ground (8) it is strenuously argued by counsel that (a) prosecuting attorney violated section 1645 of our Statutes, forbidding such officers to comment upon the failure of the defendants to testify, and (b) that the prosecuting counsel prejudiced the rights of the defendants by informing or stating to the jury that a life sentence was subject to parole, which might be exercised any time after eight years of service in prison. The remark of prosecuting counsel forming the basis of subdivision (a) of this ground was that ''They (appellants) could talk,'' and the inference is sought to be drawn that counsel referred thereby to their failure to testify at the trial, but the record discloses that one of the counsel for defendants had preceded prosecuting counsel in making an argument to the jury and that such defending counsel, in urging the

jury to acquit his clients on the ground of mental incapacity, called their attention to the fact that neither defendant throughout the trial had spoken to their attorneys, and that his clients "Didn't know right from wrong," which latter fact he sought to establish by the silence of appellants during the trial in not speaking to their counsel. It was in response to that argument that prosecuting counsel made the remark complained of, and we think in the circumstances it could not possibly be construed as the remotest comment upon, or the calling of the attention of the jury to the failure of appellants to testify. Other remarks of even less force are also complained of, but they are so clearly without merit as that no reference will be made to them.

When the objection forming the basis of subdivision (b) of this ground (8) was first presented to this court it was held that such information, so imparted to the jury, was not only improper, but was calculated to have such prejudicial effect as to authorize a reversal of the judgment of conviction, and that is particularly true with reference to the case of Berry v. Commonwealth, 227 Ky. 528, 13 S. W. (2d) 521, and, perhaps, also the case of Postell v. Commonwealth, 174 Ky. 272, 192 S. W. 39. However, following the Postell Case and before the rendition of the opinion in the Berry Case, a number of others presented the same question, and in which we condemned the practice but declined to reverse the judgment therefor. Some of them are: Chappell v. Commonwealth, 200 Ky. 429, 255 S. W. 90; Bolin v. Commonwealth, 206 Ky. 608, 268 S. W. 306; Hall v. Commonwealth, 207 Ky. 718, 270 S. W. 5, and Moore v. Commonwealth, 223 Ky. 128, 3 S. W. (2d) 190. But in still later cases the rule as announced in the Postell and Berry Cases was modified, even to the extent of impliedly overruling them on that question of practice, i. e., that it would not be reversible error for counsel to so comment to the jury unaccompanied by any other objectionable and prejudicial remarks. Such later cases are Tiernay v. Commonwealth, 241 Ky. 201, 43 S. W. (2d) 661; Holmes v. Commonwealth, 241 Ky. 573, 44 S. W. (2d) 592; Glenday v. Commonwealth, 255 Ky. 313, 74 S. W. (2d) 332; Tate v. Commonwealth, 258 Ky. 685, 80 S W. (2d) 817; Lee v. Commonwealth, 262 Ky. 15, 89 S. W. (2d) 316; Underwood v. Commonwealth, 266 Ky. 613, 99 S. W. (2d) 467, and Commonwealth v. Denny, 271 Ky. 608, 112 S. W. (2d) 1016. So that, the ruling as so un-

qualifiedly announced in the Postell, Berry and other similar cases—if there be any—has been discarded in the later opinions, and to the extent Postell and Berry cases are in conflict with the later opinions they are hereby expressly overruled, and which the later cases in effect did but without an express statement to that effect.

Counsel for appellants in their commendable effort to find some ground for reversing the judgment pronounced against their unfortunate clients seem to argue that there was a failure of proof of the requisite corpus delicti; but their argument is based upon counsels' misconception of what is the requisite corpus delicti in criminal cases. In homicide cases it is the dead body, with indicated criminal intent, which in this case was clearly proven. It is true that in this case it was not shown positively by express proof that one of the mutilated bodies was that of the murdered victim in this case, Martha Short, but that fact was abundantly proven by circumstances, so conclusive that no reasonable mind can doubt the proposition that the smaller body found in the burned residence was that of Mrs. Short. The corpus delicti, as well as the identity of the murdered victim, may be proven by circumstantances the same as any other necessary fact to conviction.

In passing upon cases, circumstanced as is this one, it is difficult to restrain the impulses of our human nature and to allow our sympathy for the youthful appellants to permit us to accept and give effect to the weakest of reasons to reverse the judgment. We have not reviewed or determined this case without such influences operating upon us; but the testimony of the guilt of appellants, as contained in the record, withholds from us even such color of excuse for interfering with the judgment. We possess no power to commute sentences —our authority extending only to the correction of prejudicial errors in the trial.

There being none found, the only course open to us is to affirm the judgment, which is accordingly done; the Whole Court sitting.