## Sandefur v. Commonwealth.

(Decided May 16, 1911.)

### Appeal from McLean Circuit Court.

1. Idiot—Definition of—An idiot is a person who has been from birth or infancy deficient in mental capacity, and destitute of the ordinary intellectual powers.

2. Idiot—Carnal Intercourse With—Sufficiency of Evidence—Confession of Accused—Where a person is indicted for having carnal intercourse with an idiot he may be convicted on evidence of his confession of guilt, when there is other evidence independent of the confession showing that the idiot had a child about nine months after the accused had intercourse with her. The birth of a child is in itself evidence

of the commission of the crime, and in connection with the confession will warrant a conviction.

3. Confessions—Proof that a Crime was Committed—If there is evidence independent of a confession that the crime charged has been committed it is not proper to instruct the jury that a confession will not warrant a conviction, unless accompanied with other proof that such an offense was committed. It is not essential that there should be other evidence than the confession that the accused committed the offense, if there is other evidence independent of the confession that the offense was committed.

4. Continuance—It is not error to refuse a continuance on account of the absence of witnesses when the evidence of the absent witnesses would be merely cumulative.

5. Trial Judge may Request Jury to Make Verdict.—Trial judges may advise juries who are apparently unable to agree upon a verdict of the importance of coming to an agreement and request them to do so; but he should not by threat or entreaty attempt to coerce a verdict or exert his authority to force an agreement, nor should he under any circumstances or in any manner indicate the character of verdict that the jury should return.

GLOVER H. CARY, F. A. LOCHRY, W. G. NEWTON and L. P. TANNER for appellant.

JAMES BREATHITT, Attorney General, and TOM B. McGREGOR, Assistant Attorney General for Appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellant was indicted under section 1155 of the Kentucky Statutes reading:

"Whoever shall unlawfully, carnally, know a female under the age of sixteen years or an idiot shall be confined in the penitentiary not less than ten nor more than twenty years."

The indictment charges that he unlawfully and carnally knew and had sexual intercourse with Ruth Smith, an idiot. Upon a trial the jury found him guilty and fixed his punishment at confinement in the State prison for ten years.

The errors relied on for reversal are (1) that Ruth Smith was not shown to be an idiot; (2) that the testimony of T. D. Little relating to confessions made by the appellant was incompetent; (3) that the evidence for the Commonwealth was not sufficient to authorize a verdict of guilty; (4) that the court erred in failing to properly

instruct the Jury; (5) that a continuance should have been granted; (6) that the Attorney for the Commonwealth was guilty of misconduct in his argument to the jury; (7) that there was no evidence that the offense charged in the indictment was committed in McLean county; and (8) error of the court in requesting the jury to make a verdict.

It was of course indispensable to a conviction that the Commonwealth should establish that the prosecutrix Ruth Smith was an idiot. The evidence upon this question is in substance this: She was an unmarried woman, about twenty-one years of age, whose mother had died some three years before the alleged criminal conduct of appellant occurred. A number of witnesses testified that from her infancy she had been feeble-minded; that she did not learn to talk until she was eight or nine years old, and always had an impediment in her speech. That she did not play with other children or as other children did, or take part in the games that children engage in and enjoy. Nor did she ever take any interest in, or seem to understand what was going on about her. That although sent to school for sometime, she scarcely learned anything and could not so much as write her name intelligibly. That she knew her parents and relatives and could go about the streets and in the neighborhood unattended. At the table she knew what she wanted to eat and took the food and other things that were handed to her; but, in this and in other matters during the lifetime of her mother, she depended as a child would upon its mother for everything. She seldom talked to any person, and if asked a question would answer it generally in monosyllables— yes or no. She did nice needle work, but could not make any garments. She could cook plain bread, meat, potatoes and other simple articles, and do such household work as sweeping and the like when some one told her what to do. A baby was born of her intercourse with appellant, but she did not seem to appreciate or understand that she was the mother of a child, and treated her offspring as a small child would a doll. In short, we may say from the evidence that the prosecutrix was virtually destitute of reason and did not have ordinary intellectual powers or sufficient mental capacity to appreciate or understand the shame and wrong of having illicit intercourse or the will power to resist in any degree the endeavors of any man who might seek to take advantage

of her.   She had a glimmering of reason, but not enough to light the way, of life, and while capable of minding a simple request and doing a few little everyday things, she lived and moved unconscious of what was going on about her.   This being her condition, we think it was for the jury to say whether or not she was an idiot, and that the jury did not make any mistake in finding that she was as they did when they returned a verdict of guilty.

It is not necessary to constitute an idiot in the meaning of the statute, or even generally, that the person shall have been wholly destitute of mind from infancy or totally deficient in intellectual power.   The word "idiot" is variously defined by law writers and courts, and while the definitions recognize that an idiot is a person who from birth or infancy has been lacking in ordinary natural intelligence, they differ as to the degree of imbecility necessary to constitute idiocy.   Some of them go to the extent of saying that an idiot is a person wholly destitute of mental powers from birth; while others describe idiocy as mental deficiency not necessarily extending to total lack of understanding.   Webster defines an idiot as:

"A human being destitute of the ordinary intellectual powers, whether congenital, developmental or accidental; commonly a person without understanding from birth."

In Bouvier's Law Dictionary the definition given is:
"A person who has been without understanding from his nativity, and whom the law therefore presumes never likely to attain any."

In Russell on Crimes, vol. 1, page 6, the author says an idiot is:

"A fool, a madman, from his nativity, and one who has never had any lucid intervals; and such a one is described as a person that cannot number twenty, tell the days of the week, does not know his father or mother, or his own age; but these are mentioned as instances only; for whether idiot or not is a question of fact for a jury."

In Blackstone, the definition given is:
"A man is not an idiot if he hath any glimmering of reason, so that he can tell his parents, his age, or the like common matters."

"In Chitty's Medical Jurisprudence, an 'idiot' is Dec., 774, the court on this subject said:

"In Chitty's Medical Jurisprudence, an 'idiot' is defined to be 'a person who has been defective in intellectual powers from the instant of his birth, or at least before the mind had received the impression of any idea.' Again, Chitty says that idiocy consists in 'a defect or sterility of the intellectual power, while lunacy or madness consists in a perversion of intellect.' All these definitions imply either a weakness or perversion of the mind or its powers—not their destruction. Hence, an idiot cannot be said to have no will, but a will weakened or impaired, a will acting but not in conformity to those rules and motives and views which control the actions of persons of sound mind."

The trial court in the case before us defined an idiot as:

"A natural fool; a fool from birth; a human being in form but destitute of reason from birth and of the ordinary intellectual power of man."

As the word "fool" is defined by Webster to be:

"One destitute of reason or of the common powers of understanding; an idiot; a natural; a person deficient in intellect; one who acts absolutely or pursues a course contrary to the dictates of wisdom; one without judgment; a simpleton; a dolt."

We think the words "a natural fool," "a fool from birth," might well have been omitted from the instruction, although their addition to it was not at all prejudicial to appellant. Taken as a whole, the instruction fairly expressed the definition of an idiot, although we think an idiot might more aptly be defined as a person who has been from birth or infancy deficient in mental capacity, and destitute of the ordinary intellectual powers.

The question of the competency of Little's evidence and the sufficiency of the evidence generally to sustain the verdict may be considered together. The appellant was an unmarried man about thirty years of age. For several months prior to June 10, 1910, he lived and worked at his trade as a carpenter at Beach Grove in McLean county, in the neighborhood in which the prosecutrix lived; and there was evidence for the Commonwealth conducing to show that in January and

the early part of February, 1910, the appellant boarded at a house where the prosecutrix during a part of
the time also boarded, and where she went and remained occasionally over night after she had ceased to be a
regular boarder.  But there is no evidence that appellant associated with her or that he showed her any attention.  In June 1910, appellant left McLean county,
and went to Owensboro, Kentucky, where he remained
a while, and from there he went to Evansville, Indiana.
Sometime after his departure from McLean county. it
was discovered that the prosecutrix was pregnant and
on October 28th, she gave birth to a child.  In July, 1910,
a warrant for the arrest of appellant, charging him with
the offense for which he was indicted, was issued in Mc
Lean county, and T. D. Little, a constable of McLean
county went to Evansville, where the appellant then
was, and after informing him of the charge against
him, told him that he had come to have him arrested;
whereupon appellant agreed to and did return with him
to McLean county although Little did not have a requisition.  Little testifies that on the train between Evansville, Indiana, and Henderson, Kentucky, the following conversation took place:

"Sandefur asked me 'how far along do they say
the girl is?' and I says 'Well, her father says the best
he can find out, she was between four and five months
gone,' and he said, 'That won't do; I know.  You
needn't tell me about a woman being in a family way
when she had her monthlies on her bad.'  He said 'I
know better when her courses was on her than she knew
herself,' and that he kept tab on that, and he said, 'It
was between the 15th and 17th of the month.'  Q.  Did he
say in that conversation whether he had ever had intercourse with this girl?  A.  He said he had.  Q.  Did he
say where it occurred?  A.  No, sir, he did not.  Q.  In
that conversation with you, did he say anything about
the mental condition of this girl, what he knew about it?
A.  Yes, sir.  Q.  Tell the jury what he said—tell what
he said to you.  A.  He just said to me, 'Squire, I know
I am up against it.  I have acted a damn fool and I will
have to go on and take what they give me and go on.'  Q.
He knew the girl had become pregnant at the time?  A.
Yes, sir, he seemed to know.  He was very anxious when
he was arrested to know what the charge was, and he ask-

ed us a dozen times.    Q.  In that conversation about having intercourse with this girl, what did he say in that regard?  (The answer of appellant to this inquiry as related by Little is too vulgar to be put in the opinion, and it manifested an utter disregard of decency on the part of appellant.)  Q.  Had you asked him to make any statement?  A.  No sir.  Q.  Had you threatened or promised him anything, to be light on him?  A.  No, sir.''

K. J. McCurry, a barber living in Sebree, Ky., into whose shop appellant went to be shaved when on his way back from Evansville, said:

''I was living at Sebree at that time. I was working in a barber shop and he came in to get a shave. I didn't know it was Mr. Sandefur, though.  It came his turn to get into my chair, and while I was shaving him he made the remark, 'It will be the last time you will shave me for a while,' and that set me to asking him questions, and I said, 'Why?' and he said, 'I am on my way to Calhoun jail,' and I asked him what for.  I asked him what was the trouble, and he said he was in trouble with a girl, and I said, 'You are up against it if you are in trouble with a girl?' and I talked on about it, and I said, 'How old is the girl?' and he told me. I don't recollect exactly the age, it was twenty or twenty-one, somewhere along there, and I said, 'You are not up against it so bad,' and he said, 'You don't know about it,' and I said, 'How is that?' and he said, 'She is feeble-minded,' and he went ahead and talked a right smart and said that he had the durndest luck of anybody, that he could not look at a girl unless she got in a family way.''

Appellant in his own behalf denied that he had ever had any association with or criminal intercourse with the prosecutrix, and was asked this question in reference to the statements made by the barber:

''Did you say to him, or to any one else while you were being shaved, or while you were in that shop, that you had committed this offense, or in anywise admitted that you had committed this offense?  A.  No sir.  Q. Tell what you may have said to him?  A. I went to his chair and told him I wanted a shave, and told him I didn't have time in Evansville on account of being arrested, and he wanted to know what I was arrested for, and I told him they had me accused of having intercourse with a woman in Beech Grove.  And he asked me

the woman's age, and I told him I didn't know, I thought she was between twenty and twenty-three years old, from what I had found out from Mr. Little."

He denies that he told Little that he had intercourse with the prosecutrix, but was not asked to deny, nor did he deny making to Little any of the other statements testified to by Little. So that the other incriminating statements made by him to Little stand undenied. There is no pretense that any of the statements made to Little were made under duress or that they were invited by Little, or that they were induced by any hope of reward or immunity or by fear of punishment. The record shows that they were voluntary, unsolicited declarations of the appellant, made under conditions that were entirely free from any improper influence.

From what we have said of the evidence, it will be observed that its sufficiency to sustain a conviction depends upon the confessions of the accused, the fact that the prosecutrix gave birth to a child, and the circumstance that appellant had opportunity to have intercourse with her about nine months before the child was born. As the appellant admitted the act of intercourse, no other evidence of this fact was necessary. His confession was in and of itself sufficient to authorize a verdict of guilty if the intercourse took place in McLean county, as it was shown independent of the confession that the crime with which appellant stood charged had been committed. Appellant did not tell Little where the intercourse occurred, but it is shown beyond question that the only place in which appellant had opportunity to have such intercourse was at Beech Grove in McLean county, and we think this was sufficient evidence of the venue of the offense.

Nor was an instruction in the language of section 240 of the Criminal Code, providing that—

"A confession of a defendant. unless made in open court, will not warrant a conviction unless accompanied with other proof that such an offense was committed."

neccessary or proper. An instruction under this section is only proper when it is doubtful if the crime charged against the accused has in fact been committed. If there is evidence independent of the confession that the crime charged has been committed, this instruction should not be given. It is not essential that there

should be other evidence than the confession that the accused committed the crime, if there be other evidence independent of the confession that the crime was committed. For example, if "A" confesses that he killed "B" by shooting him, and the body of "B" is found and it is shown by evidence independent of the confession that he came to his death from gun-shot wounds; or, if "A" confesses to the murder of "B," and the dead body of "B" shows that he was murdered, then an instruction under the Code is not necessary, as there is proof independent of the confession that "B" was murdered. But, if "A" confesses that he killed "B," and the body of "B" is not found, although there are circumstances showing that he met a violent death, or, if the body of "B" is found and it is doubtful if he came to his death by violent means, the instruction should be given. As cases illustrative of this rule, we may refer to Green v. Commonwealth, 26 Ky. L. R., 1221. In that case Green was indicted for the murder of James Coones, and the evidence showed that the death of Coones was caused by an act or acts of violence committed by some person. The Commonwealth introduced evidence showing that Green confessed the crime, and it was insisted on appeal that the trial court should have instructed the jury in the language of section 240 of the Criminal Code, but this Court said:

"But when independent of the confessions or admissions of the defendant, there is evidence proving the corpus delicti beyond a reasonable doubt, it is unnecessary to give an instruction concerning the weight to be given to confessions. * * * In the case at bar, the corpus delicti, that is the fact that the particular crime alleged has actually been committed, was sufficiently proved independent of the confession of guilt made by the appellant out of court. Therefore it was unnecessary to give the instruction asked by him."

And Higgins v. Sommonwealth, 142 Ky., 647. In that case Higgins was charged with the murder of Culbertson, and it was proven by confessions of Higgins that she committed the crime; but the evidence while showing that Culbertson came to his death by violent means, left it in doubt whether he was killed by some scribed as a person that cannot number twenty, tell the person or struck by a passing railroad train. And so the Court said:

"If it is doubtful if the crime has been committed, the jury should be instructed in the language of this section. The defense here was rested in a: large measure on the ground that the circumstances shown were consistent with the fact that the deceased was struck by the train; and while there was evidence sufficient to go to the jury that the offense had been committed, the court should have instructed the jury as provided in section 240."

In the case before us, the birth of the child was conclusive evidence that the crime of having intercourse with the prosecutrix was committed and as the fact that she gave birth to the child was established by evidence independent of the confessions, the court properly refused the Code instruction. We have examined the cases of the State v. McCool, 53 Washington, 487, State v. Chapman, 88 Iowa 254, People v. Kearney, 110 N. Y. 188, People v. Page, 162 N. Y., 272, and find that none of them are pertinent to the case in hand, as all of them construe statutes materially different from our Code provision, and grew out of states of fact that had no similiarity to the facts of this case.

The evidence of witnesses on account of whose absence a continuance was asked would only have shown that the prosecutrix had some mental capacity; and, as a number of witnesses introduced made substantially the same statements, that it was averred in the affidavit for a continuance the absent witnesses would make, we do not think it was error to refuse a continuance.

The record shows that the case was given to the jury on January 17th, and apparently in the afternoon of that day, and after considering the case for about two hours, they reported to the court at the usual hour of adjournment that they could not agree; whereupon the court after the usual admonition, placed the jury in charge of the sheriff, and they returned into court the following morning, when the trial judge said to them:

"I hope you gentlemen rested well last night; and as you haven't considered this case in the jury room for several hours, I will now send you back to consider the matter further. This is a good jury, and you have heard all the evidence in this case, and I want you to go and decide this case for me. You will now retire to your jury room and return a verdict."

To these remarks of the judge, exception was saved, and it is now insisted that it was serious error to thus endeavor to persuade the jury to make a verdict. Trial judges frequently advise juries that are apparently unable to agree upon a verdict of the importance of coming to an agreement and request them to make a verdict if they can do so conformably to their judgment and conscience or without giving up any honest opinion that they entertain and this practice has been often approved by this court. There is no prescribed language that the judge should or may use on occasions like this. What he may with propriety say must in a large measure be left to his good judgment. But, as the exclusive right to agree or not to agree rests with the jury, the judge should not by threat or entreaty attempt to coerce a verdict or exert his authority to force an agreement; nor should he under any circumstances or in any manner indicate the character of verdict that the jury should return. From a consideration of the remarks of the judge, we do not understand that he attempted to coerce the jury into making a verdict, and certainly he did not in any manner intimate whether their finding should be guilty or not guilty. In substance, he told them that he would appreciate it if they could make a verdict, and asked them to do so. In saying this much, we do not think he exceeded the limits of propriety to an extent that would authorize us to say his conduct was reversible error, although the words "I want you to decide this case for me" might well have been omitted. Instructive cases upon the limits to which the trial judge may go in requesting a jury to make a verdict and beyond which he cannot go without impropriety may be found in People v. Sheldon, 150 N. Y., 268, 41 L. R. A., 644; City of Covington v. Bostwick, 26 Ky. L. R., 780; Randolph v. Lampkins, 90 Ky., 551.

We have examined the alleged improper argument of counsel for the Commonwealth, and do not find it objectionable.

Upon the whole case our opinion is that the appellant had a fair trial, and the judgment is affirmed.