### Ideal Motor Company v. Warfield.

(Decided December 1, 1925.)

Appeal from Christian Circuit Court.

1.  Trial—Limiting Number of Witnesses to Prove Reputation in Issue in Libel Suit Held Error.—Action of court under Civil Code of Practice, section 593, in stopping examination when defendant had introduced thirteen of his twenty-one witnesses to prove plaintiff's reputation in issue in suit for libel held prejudicial error, where no ruling had been made in advance fixing the number of witnesses.

2.  Trial—Argument that Alleged Libelous Reports were Confidential Communications Held Not Improper as Attack on Instructions and Action of Court Held Error.—In libel suit for placing of certain rating on plaintiff in reports furnished retail merchants' association, argument by defense counsel that publication was confidential and had limited circulation was legitimate as being proper for consideration of jury in fixing amount of damages, and statement of court that such argument was attack on instructions as given was calculated to mislead jury, and was improper.

3.  Libel and Slander—Instruction Defining Deadbeat Held Improper.—In suit for libel, where plaintiff had been given rating in retail merchants' association as D. B., which had certain definite meaning in association, instruction of court defining deadbeat as meaning a cheat, swindler, or defrauder of a very low grade was improper.

4.  Libel and Slander—Instructions Held Erroneous as Denying Defendant's Right in Case to Qualified Privilege.—In libel suit for giving plaintiff certain rating in retail merchants' association, instructions authorizing recovery unless jury found plaintiff was a deadbeat in fact held erroneous, as denying defendant's right in case of qualified privilege.

5. Libel and Slander—Publication Without Malice Qualifiedly Privileged, and Court should so Instruct Jury.—If publication containing credit rating of customers was made to coerce payment of debt, such was evidence of malice, but, if it was made without malice and in good faith, under belief that it was true, case of qualified privilege is made out, and court should so instruct jury.

SELDEN Y. TRIMBLE for appellant.

JOHN C. DUFFY and DUFFY & SKINNER for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Reversing.

The retail merchants of Hopkinsville, including the Ideal Motor Company, a retail automobile merchant, formed an organization which they styled the Hopkinsville Retail Merchants' Credit Association, having some forty or fifty members. Each member of the association furnished to it the total list of his credit customers, dividing them into four classes, as follows: (1) Good, (2) poor or slow, (3) undesirable, (4) D. B. (meaning dead beat). The rating given to each dealer by each merchant was indicated opposite his name. The fourth class by the rules of the association included the following:

"Those persons who won't pay; who give no attention to their bills; who avoid the creditor and his collectors; who do not realize their obligation to pay; who never pay voluntarily; and those who do not want to pay their debts, whether the said persons embraced in the said subdivision be legally solvent or not."

Mrs. Sallie Warfield was included in the fourth class in the report of the Ideal Motor Company and her name was marked on the list D. B. She learned that she had been so reported and brought this suit for libel.

The defendant by its answer pleaded the above facts, alleging that the organization was formed for no other purpose than to inform the members regarding the reliability of their customers in paying for goods sold them on credit; that all credit customers were divided into four classes according to a fixed and established schedule made by the association and that the fourth class was as above stated; that a copy of the entire list was furnished each member of the association, one copy to each; that

they were confidential; that no copy was delivered or furnished any person except members of the association and the information contained in the list was designed solely for the use of the members, and it was agreed that no member of the association should furnish or exhibit the list to any person who was not a member of the association, and that he would keep the contents entirely confidential. It further pleaded that the report was true, and alleged facts showing that it properly marked the plaintiff D. B. The allegations of the answer were controverted by reply; the case came on for hearing before a jury and they found a verdict for the plaintiff in the sum of $2,700.00. The defendant appeals.

On the trial of the case the defendant took the burden of proof, and after it had introduced thirteen witnesses to show that the reputation of Mrs. Warfield was bad for paying her debts and for evading them, the court, while the last witness was on the stand, ruled that he would not allow further testimony on this subject. The defendant had eight other witnesses whom it wished to introduce, but the court refused to allow them to testify. Section 593 of the Civil Code is in these words:

"The court shall exercise a reasonable control over the mode of interrogation, so as to make it rapid, distinct, as little annoying to the witness and and as effective for the extraction of the truth as may be; but, subject to this control, the parties may put such legal and pertinent questions as they may see fit. The court, however, may stop the production of further evidence on a particular point, if the evidence upon it be already so full as to preclude reasonable doubt.".

It will be observed that by this section the court is given a reasonable control over the mode of interrogation, and subject to this control the parties may put such legal and pertinent questions as they may see fit. But the court may stop the production of further evidence on a particular point if the evidence upon it be already so full as to preclude reasonable doubt. This rule has been applied when the fact is collateral to the main issue or the testimony is for the purpose of impeaching a witness or is expert or opinion evidence, but it has never been applied by this court to a controlling issue in the case un-

less the court has reason to believe that the purpose is simply for delay or other improper purposes. In Eaton v. Green River Coal Co., 157 Ky. 163, the court said:

"Under this provision the trial court is given a discretion, after hearing evidence that is so full upon a particular point as to preclude a reasonable doubt of the fact, to stop the production of further evidence upon that point. In applying the rule it is usual for the court, after having heard testimony upon a given point, to announce it will thereafter permit only a limited number of additional witnesses upon that point. This practice gives the party the opportunity of selecting his best witnesses, and thereby presenting his case in its strongest light."

This was followed in North Jellico Coal Co. v. Trosper, 165 Ky. 417, and in Axton v. Vance, 207 Ky. 580. In that case the court said:

"By section 904 of the statutes, the court could refuse to tax as costs more than the allowance to two witnesses, but we know of no authority under which the court may limit the number of witnesses which a party may introduce upon a controverted question."

The reputation of the plaintiff was the gist of the case. It was the controlling question in the case. The provision of the statute above quoted does not authorize the court to limit the number of witnesses a party may introduce on such a question, and it was certainly prejudicial to stop the examination when more than one-third of the witnesses the party wished to introduce had not been examined, and where no ruling had been made in advance fixing the number of witnesses that either party might introduce on the subject.

The attorney for the defendant in his argument to the jury was arguing that the publication complained of in the petition was without any malice on the part of the defendant and was extremely limited. The publication in which the rating was published, having appeared in only a small number of rating books and was a confidential communication among the merchants belonging to the credit association, none of them had a right to show any third person and which none of them did show,

according to the proof, and that there was no proof that any person outside of this group of merchants had ever seen the book or the charge complained of, and that the plaintiff's damage, if any, must be very slight for that reason; and she was not damaged at all. Thereupon the court stopped the attorney and said this to the jury:

"I don't want my instructions attacked. I have instructed the jury—it was libel unless it was true; if it was circulated simply among the merchants—it would be liable if circulated only among ten or five. I object to a lawyer making an argument against my instructions."

The argument of the attorney was a legitimate argument, for these facts were proper to be considered by the jury in fixing damages. The amount of damage would depend upon the injury to character, and this would depend upon the extent of the publication. The statement of the court was calculated to mislead the jury and was improper.

The court gave the jury, among other things, these two instructions:

"1. The court instructs the jury that they should find for the plaintiff unless they believe from the evidence that the charge contained in the publication complained of, to-wit, that she was a dead beat, was, in fact, or in substance, proven to be as published.

"2. The court instructs the jury that the expression 'dead beat,' as used herein, means a cheat, swindler or defrauder of a very low grade."

The second instruction should not have been given. The rule as to the sense in which defamatory words are to be taken is thus stated in 17 R. C. L., p. 312:

"Now, words are to be taken, not in their mildest or most grievous sense, but in that sense in which they should be understood by those who heard or read them."

To the same effect is 36 C. J., p. 1155:

"The rule now is that the words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would un-

derstand them, and according to the sense in which they appear to have been used and the ideas they are adapted to convey to those who heard or read them, and not in a sense favorable to defendant.''

When the plaintiff was marked ''D. B.'' on its list of customers, which it returned to the association, every member of that association would understand the plaintiff had been placed in class 4. What the placing of plaintiff in class 4 would mean was understood by every member of the association. They all understood that plaintiff was one of the persons indicated by the rule of the association defining who should be placed in class 4. This is what D. B. meant when the defendant used the expression and what it would be understood to mean by those to whom the report went. No one else would know what D. B. meant if he saw the list. It is not necessary to go to a dictionary to learn what a dead beat means; but the definition of who should be placed in class D. B. necessarily determines the meaning of the term to the members of this association, who alone saw the publication. In lieu of the second instruction the court should have defined D. B. or dead beat as it was defined in the rule of the association under which the term was used.

The instructions were also erroneous in that they entirely denied the defendant's right in the case of a qualified privilege. The rule on this subject is thus stated in 36 C. J., p. 1267:

''The doctrine of qualified privilege has been applied to information furnished to members or subscribers by mutual protective associations. On the other hand it is held that, where such an association is formed, not for the purpose of keeping its subscribers informed as to the credit and standing of the parties with whom they deal, but of blacklisting delinquent debtors in order to compel the payment of debts already due, publications made in furtherance of such a purpose are not privileged.''

Under this rule the question of malice must be submitted to the jury. If the publication was made to coerce the payment of a debt, this was evidence of malice, but if it was made without malice and in good faith, the defendant believing it to be true and having reasonable ground to so believe, the case of qualified privilege was made out

and the court should so have instructed the jury. Tanner v. Stevenson, 138 Ky. 578.

"The proposition that, where an alleged defamatory communication is shown to have been conditionally or qualifiedly privileged, the burden is on the plaintiff to prove actual malice, is supported by a multitude of decisions." Note, 3 L. R. A. (N. S.), p. 696.

"A privileged communication has been defined as one made upon a proper occasion, from a proper motive, in a proper manner, and based upon reasonable or probable cause. In such cases there is no *prima facie* presumption of malice from the publication. There must be some evidence beyond the mere fact of publication. Browning v. Commonwealth, 116 Ky. 286.

"A qualifiedly privileged communication takes place when the circumstances are held to preclude any presumptions of malice but still leave the party responsible for both falsehood and malice is affirmatively shown.

"Where a party makes a communication and such a communication is prompted by a duty owed either to the public or to a third party, or the communication is one in which the party has an interest and is made to another having a corresponding interest, the communication is privileged if made in good faith and without actual malice." Baskett v. Crossfield, 190 Ky. 756.

On another trial the court will give this instruction defining malice:

"With malice means from ill-will, hatred, or other wrongful motive."

Judgment reversed and cause remanded for a new trial.