## Taylor v. Commonwealth.

(Decided October 13, 1931.)

452

R. L. POPE and J. B. CAMPBELL for appellant.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee.

Opinion of the Court by Judge Richardson— Reversing.

William Taylor was indicted, tried, and convicted in the Knox circuit court on the charge of murder; the jury found him guilty of voluntary manslaughter and fixed his punishment at twenty-one years in the penitentiary. He appeals.

The appellant and Gilbert Broughton were related; the wife of deceased was a niece of appellant. Broughton was a merchant. Appellant was a farmer, occasionally working in timber when not engaged in farming. He was receiving from the federal government a pension of $19 a month. He became indebted to Broughton in a sum of about $200 for merchandise, purchased by him and his family at Broughton's store. Broughton desired to collect his account and, on different occasions, had demanded of him its payment. They lived within about three hundred yards of each other.

On the day Broughton was killed, he left his home, riding a mule, to go to his mother's. Shortly after leaving his home he returned, and when within about seventy-five yards of it, he was shot with a shotgun by appellant; the shot entering his left side, ranging up, and lodging in his shoulder. At that time, he was on his mule with saddle pockets tied to his saddle. There is an irreconcilable conflict in the testimony as to whether the appellant was in or out of the road at the time he fired the shot, and as to whether deceased had a pistol in his hand at that time.

The wife of deceased claims she witnessed the killing. She states that at the time he fired the gun, appellant was standing with it in his arms in the edge of the weeds near the side of the road; that deceased was riding his mule when appellant stopped him and engaged him in conversation; that her husband had his hands crossed

in front of him, resting them on his saddle, at the moment appellant threw his gun on him and shot; and that deceased fell off the mule and exclaimed, "Lord have mercy." She claims that at the time of the shooting she was on the front porch of her home, and that as soon as appellant shot the deceased, he immediately shot at her, one shot striking her in the arm, two in the shoulder, and one in the leg; that she obtained as quickly as she could a 25-22 Winchester rifle and fired three shots at appellant; when he again fired at her. He then ran through the weeds, and she ran to the rear of her home to an old house and again shot at him. She shot at him three times from the porch and three times from the back of her home. After the shooting appellant went away. At the time appellant shot deceased, she claimed deceased was not making any demonstration toward, nor attempting to do anything to appellant. She at once went to deceased, laid the gun she was carrying on the ground, and turned him over. The deceased was in the road, and as soon as she turned him over she felt of his pulse and discovered he was dead. His saddle pockets were tied to his saddle, laying across his legs. A fruit jar containing a white liquid was in the saddle pockets, but there was no weapon in them. The deceased at the time had no weapon of any description on or about his person. The weeds where she claimed appellant was standing were estimated by her to be several feet in height. Other witnesses stated they were five or six feet in height.

Tom Gambrell and his wife, Bessie Gambrell, at the time of the killing resided about three hundred yards from the home of deceased. They were at their home on the day of the killing. There was timber between Gambrells' home and the deceased's home. The place at which deceased was killed could not be seen by them from their home. They did not see the killing, but heard the shots which, as they described them, were two shots of a shotgun, two or three shots of a smaller gun, then a third shot of the shotgun, and two or three more shots of the smaller gun. They saw appellant running past their home with a shotgun in his arms, within two or three minutes after the shooting. Immediately, Tom Gambrell ran to where deceased was shot. He was lying across the road on his back; the saddle pockets were tied on the saddle. The deceased's hands were under his body. Gambrell examined the saddle pockets and found in them a quart jar filled with a liquid which he did not examine. He got to deceased's body about the time the

deceased's wife arrived. He was shot in the left side and his shirt was covered with blood. The load of shot ranged up toward the shoulder. He claims that the tops of the weeds near the edge of the road were broken off close to where deceased was lying. A few poles were in the weeds and a man's tracks were in the weeds, three or four steps from the road, "right around where the weeds were broken off." A man's tracks came from out of the weeds toward the road. Other witnesses residing near where the killing occurred described the shots as they heard them. Others described the condition of the weeds and the presence of the tracks therein near where the shooting occurred. As would be expected, there is a difference in the statement of the several witnesses in respect to their observations.

The appellant in his own behalf testified that he had traded at the store of deceased for one or two years, and that a dispute arose, and existed, between him and deceased about his store account. He stated that on the day of the killing he came from Middle Creek to his home; that shortly thereafter he left home to go to the August primary election. On leaving his home he carried his shotgun under his arm, or on his shoulder; walking; that he did not know Broughton had gone away from his home on that road, or that he was returning on it. He passed deceased's home, and while walking on the right side of the road, he heard the sound of horse's feet on the "creek road." On hearing it, he looked and saw Broughton coming up the creek on his right side of the road; they met each other; deceased was in plain view of him, forty yards away before they met; and on meeting each other the deceased stopped and asked where he was going. He responded he was going to the election. The deceased was "pretty drunk" and inquired of him if he wanted a drink of liquor. He stated to him that he did not. Thereupon, deceased threw his saddle pockets up on his leg, or his leg behind the saddle pockets and in front of his leg, pulled his leg around a little, and said: "Come on and go into the house with me, I have got plenty at the house and will give you all you can drink." He again informed deceased that he was going to the election and to hire some hands to work for him the next week. The deceased repeated his request to go to the house with him and get some liquor. He followed this up by saying, "When are you going to pay me?" Appellant informed him that he would pay him out of next check.

The deceased then demanded that he give him his government check. Appellant informed him that he did not have it. The deceased thereupon said to him, "God damn you, don't you move hand or foot, I am going to kill you," and immediately reached his hand into the saddle pockets and brought out a pistol, and as his hand came out with the pistol, he raised his gun and fired it, shooting one time at deceased. It was a large pistol and looked like a .45. At the time he raised his gun and fired at deceased, deceased's pistol was in his hand. Immediately thereafter three shots were fired at him from the home of deceased, by some one not seen by him. He turned around without seeing any one at the house, shot toward it, and then ran. He saw deceased's wife back of her home, going toward another house, when she shot at him again. He did not shoot at her but once. He then went to his home and remained in the cornfield until the officers came and arrested him.

Certain alleged threats made by the appellant against deceased were testified to by Clayborn Taylor. Osco Warren testified that he and appellant, in June or July, borrowed a gun from Frank Patterson, the appellant stating at the time that he was going to kill deceased with it; that witness and appellant borrowed the gun for the purpose of appellant killing deceased, and the witness to use it to kill Clayborn Taylor. The testimony of these witnesses, as well as the testimony of other witnesses who testified as to conversations with appellant relative to his indebtedness to Broughton, was competent. The weight to be given same was for the jury to determine. Without further particularizing the evidence or attempting to set it out in this opinion, it cannot be doubted that the evidence was sufficient to authorize the submission of the case to the jury.

The appellant urged as ground for reversal: alleged improper conduct of the trial court; improper conduct of the commonwealth's attorney; error of the court in refusing to grant a change of venue; error of the court in refusing to continue the prosecution; error of the court in admitting incompetent evidence in behalf of the commonwealth, and the rejection of competent evidence offered by him.

The conduct of the court complained of is his alleged improper statements during the impaneling of the jury. After seven jurors had been examined and qualified, the judge in the presence of these jurors, and in the presence

of those whose names had been drawn from the wheel, summoned, and were present to be examined as jurors made statements substantially as follows:

"The jury box is the very best place to play the game of 'snipe hunting,' 90 or 95% of the witnesses in every case in court show their partiality to the side calling them, and will color their testimony. You do not have to take any witness at 100%, some of them are not worth a cent, others of great value. I am ashamed of some of the verdicts I have to receive; some jurors are lopsided and cannot see but what the defendant ought to be acquitted or convicted. You have to have a backbone to get the sort of verdicts you may expect. The court had a good jury last term, and it is wanted by the court that the jury write the same sort of verdicts. Those who disqualify themselves because they are remotely related are not big enough to be the right sort of jurymen. Let the jury walk out and write the sort of verdicts you are not ashamed of. Let us work along together and write verdicts hand in hand, hip to hip and shoulder to shoulder, with heart to heart and head to head. I want us to try the very first case we try right—and take each other into our confidence, and if you need help, call on me."

The appellant moved to discharge the jury; his motion was overruled.

In the discharge of his duties it is presumed that a judge of a court is actuated by the highest motives of patriotism and the most laudable zeal for law enforcement and observance, and that he will not intentionally suffer himself to make any statement in the presence of the jury unduly to influence it in its verdict; nor by inadvertent or unguarded statements do so. The essential, the primary, and ultimate purpose of a trial by jury of the vicinage is to make it absolutely assured that accused will be afforded a fair and impartial trial, according to the facts adduced and the instructions given by the court. In his jurisdiction, the trial judge is not a mere Robot, or only a living automatum; nor is he a mere silent arbiter or umpire of a game of sport with the right to expect the observance of prescribed rules, by himself and those engaged, without a right, either directly or indirectly, to advise or counsel with the players in the managing of their game.

A trial judge may with propriety at the proper time, admonish the jury of its duties and obligations in the performance of its work, and of the nature and importance thereof, and advise and counsel it of the purpose, and of the majesty, of the law, to the end that it may be by both the court and the jury fairly and justly administered to all alike. But in the exercise of such right and privilege he may not by a disguised act or word or innuendo attempt to coerce, control, or influence a verdict in any case. Jurors diligently watch the actions and weigh the words of the presiding judge to divine his leanings in, and his views of, the case. Therefore, he should cautiously guard against, and refrain from, doing or saying anything in their presence or hearing which may be calculated to indicate to them his mind on any issue or question appertaining to the case.

Not every act or statement of his in the presence or hearing of the jury is accepted by this court as prima facie prejudicial to the rights of an accused. It is only such as may really be prejudicial to his rights or may have interfered with, or prevented a square deal, or interrupted substantial justice, or affected prejudicially the ultimate result. The interruption of a verdict of the jury by this court, on account of his actions or statement, during the progress of the trial, depends upon and is controlled by those complained of, and which affirmatively appear of record in each particular case. Quinlan v. Com., 149 Ky. 476, 149 S. W. 892; Sandefur v. Com., 143 Ky. 655, 137 S. W. 504; City of Covington v. Bostwick, 82 S. W. 569, 26 Ky. Law Rep. 780. This case must be reversed on another ground, and since it is hoped and expected that the address of the trial judge will not again be delivered, we deem it unnecessary to devote further time or space to its consideration or to the appellant's objection to it.

For like reasons the objection to the arguments of the Commonwealth's attorney will not be considered.

It is insisted that the court erred in refusing to grant a change of venue. An application for change of venue in a criminal prosecution must be made by the defendant by a petition in writing, verified by him, and supported by the affidavits of at least two other credible persons not related to nor of counsel of the defendant, stating that they are acquainted with the public mind in the county in which the prosecution is pending and that they verily believe the statements of the petition for

such change of venue are true. See section 1110, Ky. Statutes; Graham v. Com., 164 Ky. 317, 175 S. W. 981. Without the presentation and the filing of such petition and the supporting affidavits indicated, the court is without authority to grant a change of venue. Miller v. Com., 175 Ky. 242, 194 S. W. 320. The appellant filed a written motion for a change of venue, which was merely signed by his attorneys, and in support thereof filed his own affidavit and the affidavits of three others. No petition was filed as required by the statute supra. The supporting affidavits do not undertake to comply with its requirements. Therein the affiants undertake to give the state of public sentiment and state "they do not believe that defendant can at the present term of court obtain a fair and impartial trial from a jury selected in Knox County." The appellant's motion and supporting affidavits cannot be considered to be more than a supported motion for the selection of a jury from a county other than that in which the prosecution was pending. When so considered, it cannot be said that the court abused its discretion conferred upon him by section 194 of the Criminal Code of Practice. The right of the accused to have a jury summoned from another county rests largely in the discretion of the court. Stamp v. Com., 200 Ky. 133, 253 S. W. 242. And unless it affirmatively appears that the court has abused his discretion, his ruling thereon will not afford grounds of reversal. Frasure v. Com., 169 Ky. 620, 185 S. W. 146. The court cannot be controlled by affidavits of a defendant when satisfying himself that a jury cannot be obtained from the county where the prosecution is pending. Roberts v. Com., 94 Ky. 499, 22 S. W. 845, 15 Ky. Law Rep. 341; Bates v. Com., 189 Ky. 727, 225 S. W. 1085, and cases cited.

The appellant filed his affidavit and a supplemental affidavit in support of his motion to continue the case. It is unnecessary to consider the ruling of the court thereon for the reasons that upon another trial, if one should be had, the same grounds of continuance may not exist.

The appellant insists that a grave, and highly prejudicial, error was committed by the court in the admission of certain evidence. In our judgment this presents an inescapable ground of reversal. The vital issue—the gist of appellant's defense—was the possession of a pistol by deceased at the time and place of the killing. His widow and a Mr. Gambrell, both witnesses for the

commonwealth, testified that no pistol was found on or about the deceased immediately following the killing. The defendant testified to the contrary. The commonwealth was permitted to ask the witness, Floyd Mills, and he was permitted to answer, as follows:

"Q. Did you have any talk with him (Gilbert Broughton)? A. Yes, sir.

"Q. Tell the jury what was said between you. A. Well, I asked him, do you want to buy a pistol, and he said, 'I just sold mine a few days ago, and decided to quit carrying one, don't have any use for one.'

"Q. How long was that before he was killed? A. Well, that was something like a week before that, I will say possible."

Kittie Broughton, witness for the commonwealth, was asked and answered as follows:

"Q. Did he (Gilbert Broughton) own any pistol? A. No, Sir.

"Q. Do you know how long before that he owned a pistol? A. Yes, sir about a month, or longer.

"Q. Do you know what he done with the pistol? A. He told me that he had sold it."

The statements of the deceased made to these witnesses, and about which they were permitted to testify, were clearly incompetent, coming within the rule forbidding hearsay evidence. Also it was improper to permit his widow to testify to any communication during marriage by her husband to her. Section 606, subsec. 1, Civil Code of Practice. The appellant's only defense was that he shot deceased at a time when deceased was in the act of shooting him with a pistol. The testimony of these witnesses corroborated the other evidence tending to show that the deceased, immediately following the shot which killed him, had no pistol and that none was on or about him or in the saddle pockets in his possession. It is sufficient to say that this testimony was incompetent and we are not permitted to speculate on its influence on the mind of the jury when making its verdict. It may have influenced the jury and it may have prevented a fair trial. Its admission furnishes ample ground for a reversal. Commonwealth Life Ins. Co. v. Thornton, 180

Ky. 472, 202 S. W. 887; Dawson v. Shannon, 225 Ky. 635, 9 S. W. (2d) 998.

The witness Millie Roark was permitted to narrate a conversation she had with the appellant. It was improper to permit this witness to detail her own statements to the appellant and to express an opinion which she had formed and expressed to him in the conversation. The statements only of the appellant relating to his account with Broughton were proper to be admitted as evidence against him.

Two witnesses were introduced by the defendant who testified concerning the general reputation for truth and veracity of certain witnesses introduced by the commonwealth. After they testified, on his own motion, the court refused to permit the appellant to introduce any further testimony on the subject. Thereupon appellant avowed that by nine other witnesses named at the time by him, he could prove by each of these witnesses that they were acquainted with the general reputation for truth and veracity of these witnesses and that it was bad. The court refused to permit any of them to be introduced or to testify.

It is a general and fixed rule of procedure that the court may exercise a reasonable discretion in the production of further evidence on a particular point and limit the number of witnesses thereon, if the evidence upon it is already so full as to preclude a reasonable doubt. Commonwealth v. Thomas, 104 S. W. 326, 31 Ky. Law Rep. 899; Ayers v. Com., 195 Ky. 344, 242 S. W. 624.

In applying the rule it is usual and proper, in fact the best practice, for the court to announce in advance of the hearing of the evidence that the number of witnesses will be limited on the particular point, such as the general reputation of the witnesses for truth and veracity, or after having heard testimony on a given point, to announce that it will thereafter permit only a limited number of additional witnesses upon that point. This practice gives the parties an opportunity of selecting their best witnesses and the presenting of their case in the strongest light. Ideal Motor Co. v. Warfield, 211 Ky. 576, 277 S. W. 862; Eaton v. Green River Coal Co., 157 Ky. 163, 162 S. W. 807. The applicable rule in a criminal prosecution may be found in section 593, Civil Code of Practice. This provision and its construction and application by this court should control on such questions. The

reputation of witnesses in the present case was a collateral one and not the gist of the issue. The appellant introduced two witnesses on the particular question of the character of certain witnesses for the commonwealth; the commonwealth did not offer rebuttal evidence on it. It cannot be said that the action of the court in so limiting the number of witnesses was prejudicial to the substantial rights of the defendant, sufficient within itself to authorize a reversal. Other objections were made and exceptions were saved to other acts and rulings of the court, but we do not deem it necessary to consider them, as they may not occur on another trial.

Wherefore the judgment is reversed for further proceedings consistent with this opinion.