## Taylor v. Commonwealth.
### (Decided Nov. 15, 1935.)

FLEM D. SAMPSON for appellant.

BAILEY P. WOOTTON, Attorney General, and WILLIAM SHU-
MATE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirm-
ing.

At about 2 p. m. on Saturday, August 3, 1930, the
appellant, William Taylor, killed Cecil Broughton. The
weapon employed was a shotgun, and the scene of the
homicide was in a public road about 150 yards from

where it passed in front of the residence of deceased near which was a country store building in which he operated a merchandise business. Deceased on that morning had gone to his mother's home some few miles distant from his residence muleback, and was returning to his home riding his mule with saddle pockets across his saddle. Appellant's home was probably the same distance or a little farther from that of deceased in the opposite direction. He was indicted by the grand jury of Knox county charged with murder. At the trial thereof he was convicted and punished by confinement in the penitentiary for 21 years; but that judgment was reversed on appeal to this court for certain errors outlined in the opinion which is found in the case of Taylor v. Commonwealth, 240 Ky. 450, 42 S. W. (2d) 689, and in which a somewhat elaborate summary of the evidence for both the prosecution and the defense is set out, much of which need not be again repeated. A later trial resulted in the present conviction, followed by the same punishment, and from the verdict and judgment rendered thereon, this appeal is prosecuted.

A long list of alleged errors is set forth in the motion for a new trial, but some of which are not referred to in brief of counsel filed in this court, while some of those which are referred to therein received but a bare mention without serious pressing. In the entire body of the brief we fail to find a single case cited from this or any other court in support of any of the arguments made or the contentions urged. The arguments as thus presented may be classified as: (1) Error of the court in refusing defendant's motion for a continuance; (2) error in the admission of evidence; (3) error in the rejection of evidence offered by defendant; (4) error in not postponing the trial until the presence of absent witnesses could be obtained; (5) error in the instructions; and (6) error of the court in unreasonably limiting the time for argument of counsel; each of which will be later disposed of in the order named.

Appellant had grown a crop on a farm some three miles distant in the direction from whence the deceased was returning, and he testifies that he was on his way walking with his shotgun to the primary election held on that day to cast his vote, and was intending to go from thence to the farm he had cultivated that year where he expected to remain for some days before re-

turning to his home, although he had been absent from home and at that farm for practically the entire preceding week and had only returned home about 12 o'clock that day. He stated in his testimony that during that week he had "laid by" his crop, and later testified that his return to the farm upon which it grew was to procure some hands to finish the cultivation. Some two or three eyewitnesses testified for the commonwealth who professed to have seen practically all that occurred at the time of the meeting; one of whom was the widow of deceased, who was on the porch of her residence and claims to have seen practically all that transpired. A neighbor residing about the same distance beyond the fatal scene corroborated her in the main as to how the deceased met his death. One or two others for the commonwealth saw parts of what occurred, and to the extent they testified their testimony also corroborated the other prosecuting eyewitnesses.

Appellant alone is the only eyewitness who appeared and gave testimony in his behalf. In stating what occurred on the fatal occasion, after telling of the meeting of deceased in the road as hereinbefore given, he said: "Well, he drawed his mule out across the road and I walked around the mules head, and then he said, 'Where are you going?' I said, 'To the election.' He said, 'Do you want a drink of liquor?' I said, 'No, I don't think I do.' He said, 'Come on and go to the house, I've got plenty, and I'll give you all you can drink.' I said, 'No, I don't think I need any liquor, I'm going to hire some hands.' And then he said, 'When are you going to pay me.' I said, 'I'll pay you out of my next government check.' He said, 'Ain't you got it yet.' I said, 'No.' He said, 'Goddamn you don't move I'm going to kill you right here.' And he come out with a gun and said, 'Give me that check.'" Mrs. Broughton, the widow, in relating the same incident, stated that as her husband approached the place of the accident, riding his mule in the manner stated, defendant emerged from a patch of weeds immediately adjacent to the road and said something to deceased which she did not understand, and then raised his gun to his shoulder and shot the deceased while he was on his mule with his hands folded on the horn of his saddle; that he then fired a shot at her where she was located on the front porch of her residence and struck her body with one or two shots, when she went back into the house

and procured a 22-caliber rifle and fired three shots at him, followed by another one by him at her, after which he immediately changed his position and went out of her sight when she moved to some other point on the premises and shot at him three other times with her rifle, when defendant resumed his travel in the road in the direction he was going before the shooting.

Neighbors residing beyond that point saw him as he passed down the road with his shotgun. They also heard the shots and described the reports as corresponding with the testimony given by the widow. She, and at least one other witness, were the first ones to appear at the point where the deceased fell dead with the saddle and saddle pockets upon his dead body. The latter were examined, and no weapon was found in them, nor at any other place, but they did contain a bottle with some liquor in it. Bad feeling had existed between deceased and appellant for a period of, perhaps, some months prior to the homicide growing out of a dispute over a store account that appellant had made with deceased at his store. Appellant disputed a part of it and had failed to pay any of the other part, and threats against each other were proven by witnesses introduced by the respective sides. At least one witness testified that defendant stated to her after the homicide that deceased had both hands on the horn of his saddle when the fatal shot was fired, while another witness (Bige North) testified to a conversation he had with appellant in July preceding the homicide in which he was endeavoring to trade guns with the witness for one of long range, and during which he told witness of the controversy between him and deceased and that ''he wanted a gun to kill Cecil Broughton with.'' That testimony was reluctantly given by the witness, but it was finally obtained from him, in substance, as we have stated.

It will, therefore, be seen that the only real issue presented was whether or not the killing of deceased was done by defendant in the exercise of his right of self-defense. If so, he was entitled to an acquittal; but, if not, he was guilty of willful murder or voluntary manslaughter; the latter being a degree of homicidal guilt depending on what may have occurred in the brief conversation between the two immediately preceding the fatal shooting. The jury by its verdict gave appellant the benefit of the reasonable doubt that the testimony

might produce as to whether or not his homicidal act: was committed with "malice aforethought," and reduced the degree of his crime to that of voluntary manslaughter. We will now take up the arguments made and set out, supra, for a reversal in their order named.

■ There were two reasons urged for continuance in the affidavit filed by appellant, which were: Absence of what he claimed to be leading counsel (Hon. J. M. Robsion), and absence of witnesses. He was represented at the trial by Hon. Flem D. Sampson, a former governor of this commonwealth, and a former member of this court, and a former judge of one of its circuit court judicial districts. Neither the affidavit nor any contention in brief convince us of any merit in this ground. In the recent case of Shorter v. Commonwealth, 259 Ky. 818, 83 S. W. (2d) 483, decided on June 7, 1935, a similar contention was made by the same briefing counsel and in which the absence of the same employed counsel was complained of. In adversely disposing of it, we said: "Shorter announced 'not ready' and moved the court to continue his case because of the absence of his chief counsel, the Honorable J. M. Robsion, and on account of the absence of material witnesses, and filed his affidavit setting forth what the testimony of those witnesses would be if present. As to the absence of counsel, this which is copied from Shepherd v. Com., 82 S. W. 378, 26 Ky. Law Rep. 698, exactly pictures the situation here and affords a complete answer: 'The counsel who was absent had some months before the trial been elected a representative in Congress, and at the time of trial was necessarily absent at the seat of government in his official capacity. Appellant had other counsel present at the trial, whose reputation and standing as an attorney at law is of the best, and whose conduct of the defense shows every evidence of painstaking and competent attention. If continuance as a matter of right could be had on such grounds, it might be impossible to bring one charged with crime to trial at all.' Shorter was represented in the trial court and in this one by a man of vast learning and experience gained from years of practice, as well as a long service as a circuit judge, as a member of this court, and as Governor of this commonwealth. The defendant's present plight is not the result of any lack of skillful representation, but has resulted from lack of

favorable evidence." That statement effectually answers the same point raised on this appeal.

The affidavit stated the absence of nine alleged important witnesses, who it was also stated had been duly subpœnaed and some or all of whom had testified at one or the other of the two former trials, and whose testimony had been taken and transcribed by the court stenographer. However, it was not set out in the affidavit for a continuance what would be the testimony of any of those absent witnesses, except as to William Mills, and only a part of his testimony as contained in the affidavit was read to the jury. The affidavit did set out the testimony of some other supposed witnesses, but their names were not contained in the list of the absentees. However, what the affidavit stated would be their testimony was nevertheless read to the jury, either from the affidavit or from the testimony of such persons given on a former trial. It will thus be seen that defendant had the opportunity to get the benefit of the testimony of any or all of his alleged absent witnesses, either by incorporating their testimony in his affidavit for continuance, or by reading their former testimony given at previous trials, if transcribed and preserved, and that he availed himself of those sources to the extent he wished.

But it is stated in brief that the court refused to allow defendant to read some of the testimony set out in his affidavit and which statement appears for the first time in brief of counsel. No such refusal of the court is contained in any part of the record, and for which reason that contention cannot be considered. Upon each occasion when the testimony of an absent witness was read, the court properly stated to the jury what effect should be given to it and which conformed to the rule of practice in such cases. Moreover (as will be later referred to in discussing argument [4], supra), it was not manifested by the record that any of the alleged absent witnesses had ever been subpœnaed, or that subpœnas had ever been procured for them. In the circumstances it clearly appears that this argument is without merit.

■ Referring to this ground in brief, counsel are satisfied with making only this statement: "Commonwealth was allowed to introduce certain incompetent evidence against the appellant which defendant moved

to exclude, and which motion was overruled by the court and the appellant saved exceptions." It is needless for us to collate the cases in which it was held by us that such meager references to alleged errors will not be considered on appeal, upon the ground that one which deserves no more discussion or consideration by counsel relying on it will be considered as abandoned. However, we have closely searched the record and we have failed to find wherein the court admitted improper testimony to the prejudice of defendant. In, perhaps, one or two instances some answers of the witnesses were allowed to remain in the record that were of no materiality either way, and which would not have even a remote bearing upon the issue involved or could in the least prejudice the rights of either side. For the reasons stated, this argument must also be overruled.

■ The only testimony referred to in briefs that the court rejected, and which is complained of under this ground, was an effort on the part of defendant to prove the general reputation of the deceased as a bootlegger. His reputation for peace and quietude (especially when drinking) was permitted to be proven by all of the witnesses that defendant introduced or offered on the subject; but when some of them were asked as to his reputation as a bootlegger of liquor the court sustained the objection of the commonwealth. Not a case is cited in support of this argument, and we presume it was for the reason that none could be found to support it. On the contrary, we have held in a number of cases that such reputation was not admissible in any kind of trial, except where a defendant was being tried on a charge of violating the former liquor statute of this commonwealth, known as the "Rash Gullion Act" (Acts 1922, c. 33), and such testimony was admissible in that character of case only because that statute expressly so prescribed. It, therefore, follows that this argument should also be disallowed.

■ The case was set for trial on June 19, 1934. Immediately upon the filing of the motion for a continuance the court issued attachments for the absent witnesses and appointed a special bailiff to immediately go after and arrest and bring them in court. He departed on that day upon that mission armed with the necessary legal processes and the entering into the trial was postponed until the next day, the 20th. It was com-

menced on that morning and the testimony was finished by 5 o'clock that afternoon when a recess of the court was taken until 7 o'clock p. m. When that hour arrived the special bailiff had not returned with any of the witnesses, and had made no official report to the court. None of the testimony of any of the witnesses whom he had been ordered to arrest and produce in court and who had not testified at former trials was set out in the affidavit for a continuance, further than to say their testimony was "material to the defense," and the court upon the convening of the night session ordered the trial to proceed; the remaining portion of which was largely for the arguments of counsel.

In the circumstances, we fail to comprehend wherein the court erred in pursuing the course it did. Before doing so he inquired if the witnesses had been subpœnaed, having theretofore accepted the statements of counsel as contained in the affidavit for a continuance that they had been. But upon investigation then made it was developed that none of such witnesses had ever been subpœnaed. If such subpœna, if issued, had become lost no effort was made to show that fact and none such was found in the record. Neither the clerk who should have issued them, nor the officer who should have executed them, was offered to be introduced, and in the circumstances, considering the fact that defendant could get the benefit of the testimony of the witnesses in either of the two methods hereinbefore referred to, and the further fact that this case had been pending for four years, we are disinclined to hold that the court erred to the prejudice of the defendant. Certainly no valid claim could be made that defendant was entitled to the testimony of an absent witness without manifesting to the court in some way what that testimony would be; but which, as we have seen, was not done as to a number of the witnesses whom the special bailiff was directed to arrest and produce, nor does counsel, even in his brief, enlighten us as to what that testimony would be.

■ The only two points pressed in support of argument (5) are: That the court erred in the voluntary manslaughter instruction in saying to the jury that if it believed beyond a reasonable doubt that the killing was done "upon provocation reasonably calculated to excite the passions of the defendant beyond the power of his

control," etc., then he should be convicted of the lesser degree of the offense charged in the indictment. The criticism is that the quoted language of the instruction improperly defined one of the elements of voluntary manslaughter. No case is cited in support of that argument, and we have compared the criticised instruction with a number of others appearing and approved in prior opinions of this court, and the quotation complained of is literally copied from a great number of those instructions. We are, therefore, convinced that this criticism of counsel is without merit.

The further contention is made in support of this argument that it was the duty of the court to define to the jury the phrase "imminent danger" creating the condition under which defendant might exercise his right of self-defense, as contained in the instruction submitting that defense. We are likewise cited to no case supporting that contention, and counsel's insistence upon it, as contained in his brief, is limited and confined to this statement only: "The self defense instruction is also erroneous in more than one particular, and especially in the employment of the word 'imminent' in connection with the word 'danger,' without defining the word 'imminent' and 'danger' and without informing the jury just what is meant by such an expression."

The words "imminent," and "danger," are both of universal and common use, and their definitions are about as familiar to the masses of the people as is that of most any other word in the language. To require a judicial definition of them to be submitted to the jury would also require the court to define most of the ordinary common words employed in the framing of an instruction, and which, in many instances, would be impossible for the court to make plainer or the meaning more easily comprehended than what is contained in the words themselves. Without further comment, we unhesitatingly say that the law exacts no such duty on the part of the court relating to such familiar terms as the ones referred to.

■ Lastly, it is contended in support of argument (6) that the court allowed only forty minutes to the side to argue the case to the jury, which it is insisted was unreasonably short, and for the error so committed the judgment should be reversed. To begin with, the tes-

timony in the case consisted of only 199 pages of the record, written double-spaced. It was heard and completed by 5 o'clock p. m. on the one day consumed in its introduction. The testimony on the crucial point in the case (i. e., what happened at the immediate time of the meeting of the deceased and appellant at the place of the homicide) was comparatively brief and confined to the testimony of but few witnesses. Forty minutes, it occurs to us, was reasonably sufficient for a thorough presentation and discussion of all of the testimony adduced at the trial.

But an examination of the record expressly shows that the court allowed to defendant's counsel one hour in which to argue the case to the jury. That ruling of the court was made in disposing of a motion by defendant's counsel "to give each of the parties a reasonable time in which to argue the case and the defendant thinks he should have at least one hour and a half on a side." The commonwealth objected to the giving of that much time, and the court then stated that he would allow "the defendant an hour." It does not appear anywhere in the record that the time so fixed was violated by the court, and for which reason also we are unable to sustain this contention.

The trial under consideration was presided over by Special Judge J. D. Tuggle, an eminent attorney of Barbourville, Ky. The record shows that he conducted it with skill and ability, and with complete freedom from partiality towards either side. It was for the jury to say which theory of the case, as presented by the testimony, it would accept. It chose to accept the most merciful one available to the defendant, if he was guilty at all. We fail to find in the record any ground for disturbing the verdict, and for which reason the judgment is affirmed.